IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Scott Group, | Case No. 4:13 CV 1636 |
| Petitioner, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Norm Robinson, *Warden*, | |
| Respondent. | |

**INTRODUCTION**

Charity Agee left Robert and Sandra Lozier's Youngstown, Ohio bar in the early morning hours of New Year's Day 1997 and was never seen alive again. About two weeks after Agee's disappearance, the Loziers visited the bar on a Saturday morning, while the bar was closed to the public. Sandra heard a knock at the bar's exterior door as she tallied the prior night's receipts. She peered through the door's peephole, recognizing Petitioner Scott Group as the regular Ohio Wine deliveryman. Group said he needed to check the bar's invoices to confirm a past delivery. Sandra led Group into the bar's office. After reviewing invoices, Group asked to use the bathroom.

Group returned to the office holding a gun in both hands. He ordered the Loziers into the men's bathroom. Once there, Group said "he was the brother of the girl that was missing." (In fact, Group and Agee are not related and did not know each other.) The Loziers assured Group they had cooperated with police, who continued to investigate Agee's disappearance. Group shot both Robert and Sandra in the head, killing Robert. Despite gunshot wounds to her head and throat, Sandra

survived and, at trial, identified Group as her husband's killer. A jury convicted Group, and he was sentenced to death for Robert's murder. *See State v. Group*, 98 Ohio St. 3d 248, 249–54 (2002).

Group now seeks federal habeas corpus relief. Group moves for discovery in support of his habeas claims (Doc. 40). For the reasons below, this Court denies Group's Motion.

## BACKGROUND

Group appealed his conviction and sentence. As part of his direct appeal, Group raised ineffective assistance of trial counsel claims. The Ohio Supreme Court rejected those claims on the merits. *Group*, 98 Ohio St. 3d at 268–70.

Group also pursued state post-conviction relief, presenting for the second time certain ineffective assistance claims with supporting evidence. The trial court dismissed the claims on res judicata grounds, and the Ohio court of appeals affirmed. *See State v. Group*, 2011 WL 6230353, at \*\*14, 18 (Ohio Ct. App.). Group's post-conviction petition also contained ineffective assistance claims not presented on direct appeal. The trial court found these new claims barred by res judicata and the court of appeals affirmed, also denying the claims on their merits. *See id*. at \*\*14–15, 17–19. The Ohio Supreme Court declined to hear Group's appeal. *State v. Group*, 135 Ohio St. 3d 1431 (2013) (table case).

In his habeas Petition, Group raises many of the same ineffective assistance claims, which he collects in his first through fourth grounds for relief (*see* Doc. 16 at 34, 40, 50, 63). Group also raises new ineffective assistance sub-claims which are related to claims he raised in state court. He seeks discovery to excuse procedural default or bolster the claims' merits (*see* Doc. 40 at 13, 15, 16–17, 18–19, 20–21).

**STANDARD OF REVIEW**

**Discovery and *Cullen v. Pinholster***

"[U]nlike the usual civil litigant in federal court, [a habeas petitioner] is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Rule 6 of the Rules Governing Section 2254 Cases allows the discovery available under the Federal Civil Rules "if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to [take discovery], but not otherwise." Habeas Rule 6(a).

"Good cause" for discovery exists only "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908–09 (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)) (ellipsis in original). Habeas Rule 6 does not "sanction fishing expeditions based on a petitioner's conclusory allegations." *Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004) (quotation marks omitted). Instead, Group must show good cause for discovery through "specific allegations of fact." *Id.* (quotation marks omitted).

This Court does not apply Habeas Rule 6 in isolation. When a state court has already decided a constitutional claim, a petitioner must show that decision was contrary to, or an unreasonable application of, clearly established federal law based only on "the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 131 S. Ct. 1388, 1398 (2011); *see also* 28 U.S.C. § 2254(d)(1). "[R]eview under § 2254(d)(1) focuses on what a state court knew and did," and "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court." *Pinholster*, 131 S. Ct. at 1399. Likewise, a petitioner who says a state court's ruling depends

on unreasonable findings of fact generally may point to only "evidence presented in the State court proceeding." *Wood v. Allen*, 558 U.S. 290, 293 (2010).

"[F]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Pinholster*, 131 S. Ct. at 1401 (quotation marks omitted). As a result, "district courts are precluded from conducting evidentiary hearings to supplement existing state court records when a state court has issued a decision on the merits with respect to the claim at issue." *Ballinger v. Prelesnik*, 709 F.3d 558, 561 (6th Cir. 2013).

*Pinholster* considered only the evidence which may be examined during Section 2254(d)(1) review; it did not construe Habeas Rule 6. But the Sixth Circuit has, under Section 2254(d)(1) review, disregarded evidence gathered during federal habeas proceedings. *See Loza v. Mitchell*, 766 F.3d 466, 494 (6th Cir. 2014). "It would defy logic to preclude a petitioner from developing factual information in an evidentiary hearing [under *Pinholster*], but allow [the petitioner] to introduce the same factual information via discovery and expansion of the record." *Caudill v. Conover*, 871 F. Supp. 2d 639, 646 (E.D. Ky. 2012).

*Pinholster* therefore defines the evidentiary basis for examining whether a state court factual finding or legal conclusion was "unreasonable," as habeas jurisprudence defines that term. *See* 28 U.S.C. § 2254(d)(1), (d)(2). But if a habeas petitioner clears this high hurdle, triggering de novo federal review of the constitutional claim, *Pinholster*'s restriction falls away.

> An offender who believes he is entitled to habeas relief must first present a claim (including his evidence) to the state courts. If the state courts reject the claim, then a federal habeas court may review that rejection on the basis of the materials considered by the state court. If the federal habeas court finds that the state-court decision fails [Subsection] (d)'s test (or if (d) does not apply), then a[ Subsection] (e) hearing may be needed.

4

*Pinholster*, 131 S. Ct. at 1412 (Breyer, J., concurring in part, dissenting in part).  A federal habeas court may also consider new evidence when deciding whether to excuse procedural default.  *See House v. Bell*, 547 U.S. 518, 537–38 (2006); *see also Cunningham v. Hudson*, 756 F.3d 477, 487 n.4 (6th Cir. 2014).

**Deciding Group's Discovery Motion**

*Claims Adjudicated on the Merits*.  Reading Habeas Rule 6 in light of these principles, Group's discovery request faces a problem: He seeks discovery before this Court has decided whether state court adjudication of his claims rests on unreasonable legal or factual findings, and thus before this Court can know whether it may consider the discovery he seeks.  The Supreme Court and the Sixth Circuit have not declared whether a habeas petitioner can stage discovery in this way.  *See Pinholster*, 131 S. Ct. at 1411 n.20.  Some district courts in this Circuit have permitted discovery before engaging in Section 2254 analysis.  *See, e.g.*, *Conway v. Houk*, 2011 WL 2119373, at \*3 (S.D. Ohio) ("*Pinholster* did not . . . speak to the standards governing discovery set forth in Rule 6" and "[t]hat is reason enough to refrain from invoking *Pinholster*'s restrictions at the discovery phase.").  But that approach can lead to wasteful discovery.  "Because any new evidence derived from [discovery] might never even be considered by the Court, it seems advisable to delay [definitive] ruling on the motion[ for discovery] until the petition is reviewed on the merits."  *Caudill*, 871 F. Supp. 2d at 649.

Therefore, this Court reviews Group's discovery requests for (1) good cause under Habeas Rule 6 and (2) "admissibility" under *Pinholster.*  This Court will deny without prejudice any discovery that relates to a claim adjudicated on the merits in state court.  In a later order, this Court will review Group's Petition, based solely on the state-court record.  If this Court concludes during

5

full-petition review that the state court's treatment of a claim was unreasonable, Group may renew relevant portions of his discovery motion.

***Defaulted Claims.*** Group's discovery request faces a second problem: The Motion seeks discovery for claims which Group may have defaulted in state court. A federal court may not grant habeas relief to a state prisoner "unless it appears that the applicant has exhausted the remedies available in the courts of the State; or there is an absence of available State corrective process; or circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1). If a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). A petitioner requesting discovery must therefore show "the information sought would . . . establish[] cause and prejudice for the asserted procedural default" of the relevant claim. *Owens v. Guida*, 2002 WL 1398544, at *2 (W.D. Tenn.); *see also Bagley*, 380 F.3d at 975–76.

The State's procedural default arguments invoke Ohio's res judicata rule, which bars a defendant from raising in post-conviction review a claim that was or could have been raised on direct appeal. *See State v. Perry*, 10 Ohio St. 2d 175, 180 (1967). This *Perry* rule is an "independent and adequate state ground" that bars habeas review. *See Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001).

However, if a defendant "had no means of asserting the constitutional claim . . . until his discovery, after the judgment of conviction, of the factual basis for asserting that claim," then the

6

claim "was not one that could have been raised . . . before the judgment of conviction, and hence could not reasonably be said to have been . . . waived." *Perry*, 10 Ohio St. 2d at 179. A petitioner may therefore present extra-record evidence in support of a claim on post-conviction review and have the post-conviction review court reach the merits of that claim. *See, e.g.*, *State v. Smith*, 17 Ohio St. 3d 98, 101 n.1 (1985).

Not just any new evidence will do. Extra-record evidence must (1) "demonstrate that the petitioner could not have appealed the constitutional claim based upon information in the original record" and must be "competent, relevant, and material," and (2) meet a "threshold standard of cogency; otherwise it would be too easy to defeat the holding of *Perry* by simply attaching as exhibits evidence which is only marginally significant and does not advance the petitioner's claim beyond mere hypothesis and a desire for further discovery." *State v. Lawson*, 103 Ohio App. 3d 307, 315 (1995) (quotation marks and citation omitted). If "the allegations outside the record upon which [a petitioner] relies appear so contrived, when measured against the overwhelming evidence in the record of trial counsel's competence, as to constitute no credible evidence," a court may find the claim barred despite the extra-record evidence. *State v. Cole*, 2 Ohio St. 3d 112, 114 (1982). "[A]n incorrect application of a state *res judicata* rule does not constitute reliance on an adequate and independent state ground" that bars federal habeas review. *Wogenstahl v. Mitchell*, 668 F.3d 307, 341 (6th Cir. 2012). And in the absence of an alternative ruling by the state court on the merits of a claim, if this Court determines the state court incorrectly applied res judicata, it may review the merits of the claim de novo. *See Post v. Bradshaw*, 621 F.3d 406, 424 (6th Cir. 2010).

7

**DISCUSSION**

**Cross-Examination of Sandra Lozier (First Ground for Relief)**

Group seeks discovery for three sub-claims that together form his first ground for relief: Trial counsel should have: (1) drove home inconsistencies between Sandra's description of her shooter and Group's physical appearance; (2) used medical records to impeach Sandra's statement that she lost consciousness after the shooting; and (3) emphasized that she could not recall Group's name, even though Group's name was visible on the Ohio Wine uniform he wore during deliveries to the bar (*see* Doc. 40 at 12–13).

*Inconsistent Shooter Description*. Raised for the first time in Group's post-conviction petition, the state courts found Group's inconsistent-shooter-description sub-claim barred by res judicata. *See Group*, 2011 WL 6230353, at *17. Because he says the state courts improperly applied the res judicata bar, Group argues this Court reviews the claim de novo (Doc. 40 at 10; *see also* Doc. 34 at 10–12).

The Ohio court of appeals correctly applied the *Perry* rule to bar review of this sub-claim. Group points to two pieces of extra-record evidence offered in support of this sub-claim on post-conviction review (*see* Doc. 34 at 18). First, Group presents a police report, which recorded a discussion Sandra had with police soon after the shooting (*see* Doc. 21-6 at 184–85). Detective Sgt. Daryl Martin wrote: "She gave a description as follows: Shakes, she thinks he's maybe a[n] alcoholic, 5'9" to 5'10", thin build, blue jeans, dark blue shirt, no beard or mustache, hair color same as mine, sandy blond" (*id.* at 185). Second, Group points to a series of undated photographs of himself, including one photograph that had been a trial exhibit (*see id.* at 193–95; *see also* Doc. 21-12 at 162). None of this is *cogent* extra-record evidence. *See Wogenstahl*, 668 F.3d at 342.

The police report is at most only a "marginally significant" part of Group's first sub-claim. *Lawson*, 103 Ohio App. 3d at 315 (quotation marks omitted). The jury heard much (though not all) of this inconsistent description. Trial counsel cross-examined Martin on the description contained in the report, eliciting each significant component of the inconsistent description (*see, e.g.*, Doc. 22-5 at 561) ("Q: And isn't it true that she described the shooter as having a thin build? A: Yes."). Detective Datko likewise confirmed on direct examination that, shortly after the shooting, Sandra described her shooter as "male, white, blond hair, tall, thin, 30s" (Doc. 22-4 at 468). Trial counsel again elicited this description on cross-examination (*id*. at 479–80). Sandra testified that her shooter was about her husband's height but weighed less than her husband (*id*. at 545–46), a description that, Group says, pegged her shooter as both shorter and thinner than Group (*see* Doc. 34 at 28). Finally, Sandra's 911 call was played for the jury and entered into evidence (*see* Doc. 22-4 at 520; *see also* Doc. 21-12 at 1). During the call, Sandra again described her shooter as "skinny, blond hair, . . . . male, white" (Doc. 26 (911 Call) at 2:47–2:51). At the time of the shooting, Group stood 6'1", weighed 190 pounds, and had red hair.

This Court also notes that Group's inconsistent-shooter claim depends on the view that Group in fact was heavier and appreciably taller than Robert, who Sandra used as a point of comparison to describe her shooter (Doc. 22-4 at 546). But Group has not even provided cogent extra-record evidence showing that was the case. Group's only precise description of his weight at the time of the shooting comes from a January 31, 1997 police report, which describes Group as 6'1" and 190 pounds (Doc. 16-3 at 1). The same report describes Robert as 6' and 200 pounds (*id*.). According to the January 31 police report, Group was, in Sandra's words, "close to [her] husband's height" and "thinner than [her] husband (Doc. 22-4 at 546).

9

But to help the argument that Group was stockier than Robert -- and therefore did not resemble Sandra's shooter description -- Group does not point to the January 31 police report. Instead, based on the coroner's report, Group asserts that Robert weighed 175 pounds at the time of his death. However, the coroner expressly stated his description of Robert's weight was an estimate (*see* Doc. 16-1 at 1) ("Weight: 175 # (est.)"). Group does not explain why the January 31 police report is reliable enough to serve as proof of his own weight, but not reliable enough to establish Robert's weight.

The post-conviction review court also discounted Group's undated photographs, noting they were "unauthenticated" and not "cogent evidence." *See Group*, 2011 WL 6230353, at *17. That ruling was correct. The record on direct appeal contained another photograph of Group, showing Group's hair was not "sandy blond" nor "wavy" (Doc. 21-12 at 162). And the jury could compare Sandra's description of the shooter, as relayed through Martin, Datko, and the 911 recording, with Group as he appeared in the courtroom.

Trial counsel made this very point during closing argument, stressing that Sandra's description of a thin, blond-haired shooter of average height was "our initial description when it was fresh in her mind" (Doc. 22-7 at 134), and asking the jury to compare Group as he appeared in the courtroom with Sandra's inconsistent description (*id*. at 136–37) ("He is six-one and weighs 190 pounds. He testified to that. Draw your own conclusions.").

Trial counsel argued "[w]hat [wa]s most credible about Scott Group" was the many ways in which he did not resemble Sandra's description (*id*. at 136). The jury likely doubted aspects of Group's testimony -- for example, his explanation of the meaning behind coded letters he sent to friends while in pretrial custody, letters which suggest Group had asked others to murder Sandra

10

before trial (*see* Doc. 21-12 at 96) ("In your letter you sent me last week you said you would take care of that flat tire for me and now that your [sic] out, I hope that you do because it's a matter of life or death (mine) [here, Group lists Sandra's home address]"). But Group's facial structure, hair, height, and weight could not lie. None of these physical characteristics fit Sandra's description (*see* Doc. 22-7 at 136 (Trial counsel during closing argument: "Can we describe this man[, Group,] as thin?")). Even without more probing cross-examination of Sandra, trial counsel's argument is a powerful use of the evidence during closing. The jury rejected that argument by finding Group guilty, but that does not mean trial counsel's use of Sandra's inconsistent description was deficient. The additional, undated photographs were merely cumulative.

***Sandra's Loss of Consciousness.*** Sub-claim two focuses on medical records which show Sandra "without fail denied losing consciousness" after the shooting (Doc. 21-6 at 105; *see also* Doc. 16-5). These medical records were not part of the trial record. Nor were the records part of the post-conviction review record. Post-conviction counsel, discussing the records in the amended post-conviction petition, stated the records were attached to that petition, yet failed to file the records. *See Group*, 2011 WL 6230353, at *17. Group implicitly concedes that, because post-conviction counsel provided no evidentiary support for this sub-claim, the sub-claim is procedurally defaulted (*see* Doc. 44 at 5–6). But he contends post-conviction counsel's ineffectiveness is grounds for excusing this default.

Group cannot show prejudice from trial counsel's failure to impeach Sandra on this ground, or from post-conviction counsel's failure to file the records during post-conviction proceedings. Immediately after being shot and during trial, Sandra consistently identified the bar's Ohio Wine deliveryman as her shooter. Alongside this consistent identification, she gave inconsistent

11

descriptions of her mental state after the shooting. She told hospital workers that she had not lost consciousness after being shot (*see* Doc. 16-5). At trial, she testified she "was unconscious for a period of time" (Doc. 22-4 at 516).

Group therefore argues trial counsel was ineffective for failing to offer evidence that casts doubt on whether Sandra lost consciousness following the shooting. But had that evidence been offered, the evidence would have bolstered the critical portion of Sandra's testimony -- her claim that the Ohio Wine deliveryman had pulled the trigger. Because a jury likely would discount a witness's recall of key events if the witness lost consciousness after those events, Sandra's testimony that she lost consciousness undercut her identification testimony. The question trial counsel did not ask -- and which Group now says trial counsel should have asked -- likely would have hurt Group's defense.

And though Sandra's statements to medical staff would have contradicted a portion of her testimony, and conceivably could have affected the jury's assessment of other portions of her testimony, that alone is not enough to show prejudice. Competent trial counsel need not show all the ways in which a witness's prior statements contradict the witness's in-court testimony, particularly when impeachment of one portion of the witness's testimony strengthens other, more important testimony. Group has not shown the requested discovery "might yield evidence enabling him to prevail on any of his claims." *Bagley*, 380 F.3d at 977.

***Sandra's Knowledge of Group's Name***. Finally, because the sub-claim could have been raised on direct appeal, Group procedurally defaulted his third sub-claim, which centers on trial counsel's failure to ask Sandra why she did not know Group's name. Group's "constructive exhaustion" theory is unsupported by any binding authorities (*see* Doc. 34 at 21–22).

12

Still, Group maintains that he may pursue discovery on this sub-claim to establish "cause and prejudice" for the default (*see id.* at 22; *see also* Doc. 40 at 13) (listing requested discovery). He does not explain how any of the requested discovery would help establish cause or prejudice for this claim, and none of it would.

The basic premise of Group's sub-claim -- that trial counsel did not pursue this avenue to undermine Sandra's testimony -- is wrong. During closing argument, trial counsel focused on this point at length, one of several reasons he offered to doubt the reliability of Sandra's identification of Group as her shooter (Doc. 22-7 at 134–35).

> Now, [Sandra] has seen Scott Group on all these occasions, all of these occasions when she has had to write him checks and made deliveries in the tavern when he was putting wine away in the cooler. She has seen him. She knows him. Ladies and gentleman, she doesn't even know his name. You'll have another photograph, [defense exhibit 2 (*see* Doc. 21-12 at 162)] and it is kind of a silly photograph. It is Scott Group with his tongue sticking out, a picture I believe he testified was made by his daughter. And clearly there on his shirt on one side is Ohio Wine Imports on the other side in [plain] English for which one to read who might have seen him twice a month or three months before the shooting, [plain] to see is the name Scott -- Scott. It is not blind or obscured. It is not covered with tape. It is not ripped off the shirt. We know from his testimony and we know from the testimony of others that typically on the job when he was delivering wine, what did he wear -- he wore his uniform. That uniform shirt bore the name Scott, yet Mrs. Lozier doesn't know his name?

Competent trial counsel knows when to stop asking questions. By not asking Sandra why she could not recall Group's name, trial counsel prevented Sandra from explaining away her lack of knowledge, preserving for closing argument this important portion of Sandra's testimony.

And Group's own testimony shows there was a reason Sandra would not have known Group's name, even though she recognized him as the regular deliveryman: Sandra and Group had only occasional, superficial contact. Contrary hearsay statements from Group contradict his own sworn testimony (*see* Doc. 21-6 at 181).

13

Prior to the shooting, Group made deliveries to the bar some 13 times over a three-and-a-half-month period, beginning in October 1996 and ending with the shootings (*see* Doc. 21-12 at 74). Group completed each delivery in five or ten minutes (Doc. 22-6 at 34). When Group began delivering to the bar, he did not deal with the Loziers, but rather with "a big guy" who "knew Gary Markasky" -- Gary worked at Ohio Wine -- and "own[ed] the Royal Oaks [Bar]" (*id*. at 27, 32).

At some point, Group began dealing with the Loziers during deliveries (*id*.). During a typical delivery, Robert would lead Group to where Robert wanted the beverages stored. After unloading the product, Group would visit Sandra in the bar office and she would write a check for the delivery (*id*. at 33). Group testified he did not have "a lot of conversations with Sandra Lozier" and did not know her first name (*id*. at 34). In fact, Group did not recognize Sandra at trial (*id*. at 112), and claimed that, had he been handed a picture of Robert a week before trial, "I wouldn't know who that was" (*id*. at 114).

Like the other sub-claims, discovery related to trial counsel's failure to question Sandra about Group's name would not show cause and prejudice to excuse procedural default. This Court denies with prejudice Group's discovery request with respect to his first ground for relief.

**Alibi Defense (Second Ground for Relief)**

Next, Group requests discovery related to his second ground for relief: Trial counsel were ineffective for failing to present a "cogent" alibi defense, and for failing to offer evidence pointing to a different suspect, Brian Ferguson (Doc. 40 at 14–17).

Group raised these claims in his post-conviction petition, but the Ohio court of appeals found the claims barred by res judicata. *See Group*, 2011 WL 6230353, at \*19. Group notes that he and his mother offered affidavits on post-conviction review, averring that trial counsel did not adequately

14

prepare Group and his alibi witnesses (Doc. 21-6 at 173, 190). But the Ohio court of appeals could discount this extra-record evidence, offered by individuals "interested in the success of petitioner's efforts" to have his convictions set aside. *State v. Calhoun*, 86 Ohio St. 3d 279, 287 (1999).

Group concedes that, though Brian Ferguson was discussed during trial, his alternate-suspect claim was not supported by extra-record evidence during post-conviction review, and therefore the claim is procedurally defaulted (*see* Doc. 34 at 50). But he "seeks discovery to develop the 'miscarriage of justice' and 'cause and prejudice' exceptions to procedural default" (Doc. 44 at 6 n.3).

Group's discovery request is speculative. He offers only his own self-serving recitation of a hearsay statement Charity Agee's mother made to him: "Ms. Agee agreed that the description of the assailant given by Mrs. Lozier closely approximated a Brian Ferguson, who referred to Charity as his sister" (Doc. 21-6 at 172). Group's purported lead did not originate with Charity's mother though. Group claims that fellow Mahoning County jail inmate Robert Clark first told Group "he knew of a young man named Brian Ferguson" (Doc. 22-6 at 155). (Clark testified that Group approached him and asked him to lie about having seen a tall, blond-haired man leaving the Lozier's bar at the time of the shooting, and the jury could have read letters from Group to Clark as supporting Clark's testimony (*see* Doc. 22-5 at 201–02; Doc. 21-12 at 75, 83, 86)). "Brian Ferguson was the young man in the Mahoning County Jail [who] was bragging about this crime," Group explained. "[H]e did not say he committed it. He said he knew information about it" (Doc. 22-6 at 165).

Group told the jury how he planned to obtain further information about the shooting from Ferguson, claiming coded language he used in letters to Adam Perry (a one-time jail inmate) referenced a two-step plot to purchase a chain or identity bracelet with the word "Charity" on it, have Perry get Ferguson drunk, then drive a drunk Ferguson to Sandra's house. Once there, Perry

15

apparently would display the keychain and ask, "Hey, do you know who lives there?" (Doc. 22-6 at 189–90). Perry also would ask Ferguson about a different bracelet Charity had worn at the time of her disappearance (*id*. at 190).

Perry told a different story: The two-step plot was in fact a plan to firebomb Sandra's house, and Group's letters to Perry plausibly support this version of events, which the jury accepted. *See Group*, 98 Ohio St. 3d at 261. The jury found that Group had given Perry Sandra's address, instructed Perry on making a Molotov cocktail, and told him to leave the "Charity" keychain behind to create a false connection between the bar shootings and the firebombing, thereby deflecting suspicion from Group, who could not have firebombed the home because he was then incarcerated.

Group therefore seeks a broad range of evidence which might, "on information and belief," exist and implicate Ferguson (*see* Doc. 40 at 16–17), based only on a theory he developed while in jail awaiting trial and then used to deflect the prosecution's charge that he had placed a hit on Sandra. Group's assertion that Ferguson may have had a role in or known about the shooting is unsupported and not credible. Group has not established grounds for discovery to support either a cause-and-prejudice analysis, or to show a miscarriage of justice. This Court denies with prejudice Group's discovery request for his second ground for relief.

**Forensic Evidence and Expert Testimony (Third Ground for Relief)**

Group requests discovery to support claims asserted in his third ground for relief: Trial counsel were ineffective for failing to independently test DNA blood evidence found on the shoes Group wore when he voluntarily surrendered to police. Group also argues trial counsel were ineffective for failing to adequately cross-examine the State's DNA expert (Doc. 40 at 17–19).

Group raised these claims on direct appeal to the Ohio Supreme Court, which rejected the claims on the merits. *Group*, 98 Ohio St. 3d at 269–70. Group also presented the claims to the trial court on post-conviction review, with supporting affidavits from an appellate attorney and Group's mother. The trial court dismissed the claims as barred by res judicata, and the Ohio court of appeals affirmed. *Group*, 2011 WL 6230353, at **14, 18. Therefore, the state courts adjudicated these claims on the merits. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991). Because this Court's review of the claims under Section 2254(d) is limited to the state court record, *Pinholster*, 131 S. Ct. at 1401, Group's discovery request relating to his third ground for relief is denied without prejudice.

**Firearm-related Evidence (Fourth Ground for Relief)**

Group requests discovery relating to his fourth ground for relief: Trial counsel failed to develop evidence showing Group's physical impairments made it "less probable" that he could have fired a gun, and that his hands lacked gunshot residue at the time of the arrest (Doc. 40 at 19–21; Doc. 34 at 64).

Group emphasizes that only he testified about physical impairments which he claims affected his ability to hold and fire a gun -- a gunshot to his right hand and arm, and lacerations to his left arm from "put[ting] his left hand through a glass window" when he was "involved in a confrontation" (Doc. 16-9 at 4). Group further notes that the jury likely discounted his testimony. Group's credibility was undercut when, after Group testified on direct examination that he had never robbed another person, the State impeached him with a prior conviction for conspiracy to commit aggravated robbery (Doc. 40 at 19). Trial counsel was deficient, Group argues, because they did not present physical-impairment evidence from more credible sources, such as medical experts (*id.*).

17

The key components to Group's ineffective-assistance claim were part of the record on direct appeal. The Ohio court of appeals properly found that Group's physical-impairment sub-claim "could . . . have been fairly determined without resort to" extra-record evidence. *Lawson*, 103 Ohio App. 3d at 315. In addition, because Sandra testified her shooter fired the revolver using both hands, the Ohio court of appeals could conclude on the merits of the claim that evidence showing Group was "physically unable to fire a gun with [his right] hand" would not have made a difference to the jury's verdict. *See Group*, 2011 WL 6230353, at **14–15. Group also testified that despite having lost feeling in his right hand and grip strength in his left hand, he was able to carry crates as part of his job as a deliveryman. "I know when I have something in my hand -- when I'm at work, I'm handling cases all day long. I pick it up the best I can, as hard as I can" (Doc. 22-6 at 88). For the reasons described by the state courts, Group's discovery requests would not demonstrate "cause" to excuse procedural default of this sub-claim, which the state courts held, in the alternative, failed on the merits.

Group raised the gunshot-residue sub-claim on direct appeal to the Ohio Supreme Court, which rejected the claim on the merits. *Group*, 98 Ohio St. 3d at 269. Review of this sub-claim under Section 2254(d) is therefore limited to the record before the state court. *Pinholster*, 131 S. Ct. at 1401.

Group's request for discovery relating to his first sub-claim (physical impairment) is denied with prejudice. Group's request for discovery relating to his second sub-claim (gunshot residue) is denied without prejudice.

18

**Trial Counsel's Alleged Diminished Mental Capacity**

Group's final request for discovery relates to each of his first four grounds for relief. Group seeks information regarding the "possible diminished mental acuity" of his lead trial attorney, the late Andrew Love of the Ohio Public Defender's Office, who "may have been affected by the on-set of Alzheimer's disease" during trial (Doc. 40 at 24, 25).

Group bases his request on Love's alleged poor performance before and during trial (*id*. at 22–24), including Group's claim that Love "kept calling me Fred, and he called other people by the wrong name as well" (Doc. 21-6 at 174). He also offers the affidavit of Joseph Wilhelm, currently an assistant federal public defender who worked as a state public defender with Love (*see* Doc. 40-4). Wilhelm declares that "I was informed that Mr. Love was retired by the office due to the onset of Alzheimer's disease. I do not recall the date when I was given that information" (*id*. at ¶ 11). He does not know when Love was retired, but states that the retirement occurred "before I left [the office] in September 2009" (*id*. at ¶ 12).

This Court denies Group's request with prejudice. Group stresses Love's poor performance at trial. He then points to a medical retirement which occurred at some point in the decade after trial, speculating that the alleged cause of that medical retirement, Alzheimer's disease, is also a cause of Love's poor performance at trial. Without more, that claim is too speculative to show "good cause" for discovery. This Court denies Group's discovery request with prejudice

## CONCLUSION

For these reasons, this Court denies Group's Motion for Discovery (Doc. 40) with prejudice as to his first, second, and fourth (physical impairment) grounds for relief. This Court denies with

prejudice the Motion with respect to the Love mental acuity claim. The Motion is denied without prejudice as to Group's third and fourth (gunshot residue) ground for relief.

    IT IS SO ORDERED.

                                                                        s/ *Jack Zouhary*
                                                      JACK ZOUHARY
                                                      U. S. DISTRICT JUDGE

                                                      September 18, 2015