IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Scott A. Group,                                    Case No. 4:13 CV 1636

                        Petitioner,               MEMORANDUM OPINION
                                                  AND ORDER

            -vs-
                                                  JUDGE JACK ZOUHARY
Norm Robinson, *Warden*,

                        Respondent.


## INTRODUCTION

A jury convicted Petitioner Scott Group of the 1997 murder of Robert Lozier.  On the jury's recommendation, the court sentenced Group to death.  Group now petitions for a writ of habeas corpus under 28 U.S.C. § 2254 (Doc. 16).  Respondent Warden Norm Robinson filed a Return of Writ (Doc. 24), and Group filed a Traverse (Doc. 34).  For the following reasons, this Court denies the Petition.

## FACTUAL BACKGROUND

On direct appeal from Group's conviction and sentence in *State v. Group*, 98 Ohio St. 3d 248, 249–53 (2002), the Ohio Supreme Court set out the following account of Group's crimes:

> Robert Lozier's wife, Sandra Lozier, owned the Downtown Bar in Youngstown, Ohio.
> In late September 1996, the Loziers began buying wine and other merchandise from
> Ohio Wine Imports Company.  Group, who was then employed as a deliveryman for
> Ohio Wine, made weekly deliveries to the Downtown Bar.  Group never asked the
> Loziers to sign or initial a copy of the invoice when they took delivery, a practice Mrs.
> Lozier characterized as unusual.

1

On December 12, 1996, Group brought his cash receipts to the Ohio Wine warehouse manager's office to be counted and compared against his invoices. Group's cash receipts were approximately $1,300 short. Although the police were notified, Group was never charged with stealing the missing money.

About a week before Robert Lozier's murder, Group went to the Downtown Bar and asked Mrs. Lozier to show him the bar's copies of invoices from Ohio Wine.

Less than a week before Robert Lozier's murder, two Ohio Wine employees saw Group with a revolver at work. They told him to take the gun out of the building, since possessing a firearm in the warehouse was illegal.

The day before the murder, Group quit his job at Ohio Wine. That night, two witnesses saw Group at the Downtown Bar. One of them, Robert Genuske, who worked at the bar, recalled that a few weeks earlier, Group had come to the bar looking for Mr. or Mrs. Lozier because he wanted to talk to them about an invoice.

The next day, January 18, the Loziers arrived at the Downtown Bar around 10:00 a.m. It was a cold day and Robert Lozier went upstairs to see whether the pipes had frozen. Sandra Lozier went to an office, opened a safe, removed five bags containing approximately $1,200 to $1,300 in cash, and set them on her desk.

As she counted the cash, Mrs. Lozier heard a knock at the bar's front door. She went to the door, looked through the peephole, and saw Group. Mrs. Lozier recognized Group and let him in. She noted that he was wearing tennis shoes, jeans, a dark blue sweatshirt, and an undershirt. She particularly noticed that he wore both a sweatshirt and an undershirt because Group "never dressed that warmly."

Group told Mrs. Lozier that he wanted to check the invoices again. Mrs. Lozier led him to the office. As Mrs. Lozier and Group searched through the invoices, Robert Lozier came into the office, sat at the desk, and took over counting the money. As Mrs. Lozier later testified, "[Group] just kept going through [the invoices], and it was like he just kept staring at them."

Asking to use the restroom, Group left the office briefly. When he returned, he had a gun. Group ordered the Loziers to put their hands up and get into the restroom. Mrs. Lozier told Group to take the money, but Group replied, "This isn't about money." He forced the Loziers into the restroom at gunpoint and made them put their hands against the wall.

Group stated that "he was the brother of the girl that was missing." Mrs. Lozier interpreted this as a reference to Charity Agee, a murder victim who had last been seen at the Downtown Bar on New Year's Eve. The Loziers turned around, but Group ordered them to face the wall. Then he shot them both. He shot Robert Lozier once in

2

the head.  He shot Sandra Lozier twice: once in the back of the neck and once near her temple.

Mrs. Lozier lost consciousness.  She woke to find her husband dead on the floor.  Mrs. Lozier thought she was dying, so she tried to write "Ohio Wine" on the floor in her own blood as a clue for the police.  At the time, she did not know Group's name.  She then crawled to the office, where she managed to dial 911.  She told the operator that "the delivery man from Ohio Wine" had shot and robbed her and her husband.  The 911 call was recorded; a voice timestamp on the tape established that the call was received at 11:05 a.m.

The first Youngstown police officer to arrive at the crime scene was Detective Sergeant Joseph Datko.  Mrs. Lozier told Datko: "The Ohio Wine man shot me.  The Ohio Wine man.  Our delivery man shot us."  The money the Loziers had been counting before the shootings was gone and so was the box of invoices that Group had been looking through.

At trial, Group, his family, and a family friend gave a different account of Group's whereabouts. Group testified that, after driving his foster son to work around 7:30 a.m., he went back to his apartment, gathered some dirty laundry, and went to his mother's house to wash it, arriving around 9:00 or 9:30 a.m.  He testified that he did not know what time he had left his mother's house.  Group's mother, grandmother, and sister were at Group's mother's house that morning, along with Francisco Morales, a friend of the Group family.  The accounts given by these witnesses generally indicated that Group had arrived at his mother's house by 9:00 a.m. and had left between 11:30 and 11:40 a.m.

According to Group, after leaving his mother's house, he drove to the Diamond Tavern in Campbell, Ohio.  Group testified that he did not know how long he was at the tavern but that he had left at noon.

There were about eight customers at the Diamond Tavern.  Group bought at least two rounds of drinks for all of the customers.  A fellow patron thanked Group and said, "I'll see you," but Group replied, "You aren't going to see me anymore."  He had a similar exchange with the bartender, Bonnie Donatelli.

Group then drove to the VFW post, which took about five minutes.  The manager, Maria Dutton, was a friend of Group's.  According to Dutton, Group arrived slightly after noon and left at 12:55 p.m.  While there, Group bought a round of drinks for everyone.

Group then drove to a grocery store and telephoned his mother.  According to his mother, she received the call between 1:00 and 1:30 p.m.  Mrs. Group told her son that Youngstown police were looking for him in connection with a shooting downtown.

According to Group, he knew that he had not been downtown, so he surmised that his mother misunderstood the situation and that the police were actually looking for him because of some unpaid parking tickets. Group told his mother that he would go to the police station. Group's mother and sister intercepted him en route and went to the station with him.

When Group arrived at the police station, he spoke with Captain Robert Kane, chief of detectives, and Detective Sergeant Daryl Martin. Kane and Martin noticed what looked like blood on one of Group's tennis shoes. When questioned about it, Group told Kane that he had cut his finger. He showed Kane the finger, and there was a cut on it, but it "looked like a superficial old cut" to Kane.

After brief questioning, Sergeant Martin arrested Group. Group said, "You better check out Sam Vona," a former driver for Ohio Wine. But Mrs. Lozier did not recognize Vona's picture when Martin later showed it to her.

Group's shoe was sent to Cellmark Diagnostics for DNA testing. An expert from Cellmark testified that the DNA pattern of the blood on the shoe matched the DNA pattern of a known sample of Robert Lozier's blood. She further testified that the same DNA pattern occurs in approximately 1 in 220,000 Caucasians, 1 in 81 million African-Americans, and 1 in 1.8 million Hispanics. The testing also revealed that Group was excluded as the source of the blood.

Lisa Modarelli, an Ohio Wine sales representative, was a friend of Group's. According to Modarelli, Group confided to her that police had swabbed his hands to test for gunshot residue and that he was concerned that the test might be positive because he had been shooting a gun the day before the murder with "a friend." Later, Group told Modarelli that he had been shooting with his foster son, but Group's foster son denied that he had gone shooting with Group.

Group contacted Bonnie Donatelli from jail and asked her to contact Darryl Olenick for him. Olenick was a regular at the Diamond Tavern; his hobbies were gun collecting and target shooting. Group told Donatelli that the police had found gunshot residue on his hands and asked Donatelli to get Olenick to tell police that he and Group had been target shooting together the day before the murder. In fact, Olenick and Group did not associate outside the tavern and had never gone shooting together. Donatelli promised to "see what [she] could do," but instead, she told Sergeant Martin about Group's request.

Robert Clark was an inmate at the Mahoning County Jail with Group. Clark mentioned to Group that he "was familiar with the people in the [Downtown] [B]ar." Group asked Clark whether he would "be willing to help [Group] out." Group then made up a story for Clark to tell police. Clark was to say that he had been near the Downtown Bar on the morning of the murder and had seen a man leave the bar carrying a large beer bottle

4

box.  In return, Group promised to help Clark "any way he could."  Clark later received an anonymous $50 contribution to his commissary account.

Adam Perry was another Mahoning County Jail inmate at the time of Group's pretrial incarceration.  Awaiting trial on pending charges, Perry was incarcerated with Group from December 1997 to May 1998.  Perry was released on bond in May 1998.

In a letter postmarked March 20, 1998, before Perry's release, Group begged for Perry's help with his case:

"If you do bond out, let me know.  There's something you may be able to do to help me with concerning my case.  And I'm telling you, I need all the help I can get. * * * But seriously man, and this is no joke, I need your help with something if you get out. Please don't leave me hanging?  We've known each other a long time and if anyone in your family needs help, you know I'll be there."

Before Perry was released, Group asked him to firebomb Mrs. Lozier's house.  Group assured Perry that Mrs. Lozier no longer lived there.  However, he told Perry that "[h]e didn't want Sandy Lozier to testify against him," and he wanted Perry to "firebomb the lady's house to either scare her from testifying or to lead the police into investigating others."

Group told Perry that he had $300,000 hidden away.  He offered Perry half of it in exchange for his help.  Group also offered to dissuade a witness from testifying in Perry's trial.

Group explained to Perry how to make a firebomb by mixing gasoline with dish soap in a bottle, with a rag in the neck for a fuse.  He instructed Perry to light the rag and throw it through the front window and then to drop a key chain with the name "Charity" on it on the front lawn.  "[W]hat he wanted to do," Perry explained, "was to mislead the police into thinking that the firebomb and the murder [sic] was all involved as far as Charity's abduction and murder."

In a letter postmarked May 6, 1998, Group wrote to Perry: "So I need to know on everything if that party is still on where your sister lived.  The party has to happen and happen the way we last talked.  I've got to know bro, so I can figure some other things out in the next few weeks."  Perry understood "the party" to refer to the planned firebombing of Mrs. Lozier's house.

Group also corresponded with Perry after Perry's release.  State's Exhibit 37, a letter from Group to Perry, contains the following passage: "[Y]ou said you would take care of that flat tire for me and now that your [sic] out, I hope you do because it's a matter of life or death (mine)[.]"  In the next sentence, Mrs. Lozier's address appears next to the name "Agee."

Group then wrote: "If you take care of the flat, please take care of it with that two step plan we talked about. * * * Theres [sic] $300,000.00 in a wall of a certain house * * *. Half goes to you to do what you like."

The second page of State's Exhibit 37 contains Mrs. Lozier's address and describes the house as ranch-style.  It also lists the following items: "Cheap key chain or ID bracelet -- name (Charity)" and "3 liter wine jug -- mix gas & dish soap."

In June 1998, Perry knocked on Mrs. Lozier's door.  When she answered, he asked her whether a "Maria something lived there."  Mrs. Lozier said no, and Perry left.  Perry testified that he did not want to hurt Mrs. Lozier and so, after finding her at home, he took no further action.  Perry later told the prosecutor about Group's plan.

**PROCEDURAL HISTORY**

**State-Court Proceedings**

In January 1997, a Mahoning County grand jury indicted Group on three counts.  The first, for the aggravated murder of Robert Lozier, carried with it two death-penalty specifications: murder during an aggravated robbery and purposeful attempt to kill two persons.  The remaining counts charged Group with aggravated robbery and the attempted aggravated murder of Sandra Lozier on January 18.  Each count included a firearm specification (Doc. 21-1 at 54–56).

The grand jury returned a superceding indictment in June 1998 after Perry told the prosecutor about Group's plan to firebomb Sandra's house.  It added two new counts: the attempted aggravated murder of Sandra "on or about or between April 1, 1998 and June 5, 1998"; and intimidating a witness (Sandra) "on or about or between December 1, 1997 and June 5, 1998" (*id*. at 333–36).

Group went to trial in March 1999.  The jury convicted him on all counts and specifications (Doc. 21-2 at 295).  Following the mitigation phase, the jury recommended Group be sentenced to death for murdering Robert (*id*. at 324).  The trial court accepted the jury's recommendation and imposed the following additional sentences, to run consecutively:  a ten-year prison term on the

6

attempted aggravated murder charge; a ten-year prison term on the aggravated robbery charge; a ten-year prison term on the attempted aggravated robbery charge; a five-year prison term on the intimidation charge; and a three-year prison term for the merged firearm specifications (*id*. at 324–26).

In June, with new counsel, Group timely appealed his convictions and sentence to the Ohio Supreme Court (Doc. 21-3 at 5).  He raised sixteen propositions of law, stated as follows:

1.    Appellant's due process rights protected by Amendment [XIV], United States Constitution[,] are violated when the trial court dismisses for cause jurors who express views against capital punishment.

2.    It is error for the trial court to overrule [Group's] motion to prohibit the use of peremptory challenges to exclude jurors who express concerns about capital punishment, in violation of [Group's rights under the] Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

3.    A trial court's refusal to excuse a juror who expressed a preference for the death penalty, and the inability to consider mitigation evidence and the corresponding requirements placed upon a capital defendant to excuse such a juror through the use of peremptory challenges, amounts to a denial of a fair and impartial jury and results in a denial of due process and equal protection of the laws under U.S. Const. amend. XIV and Ohio Const. art. I,  [§§] 2[,] 16.

4.    The trial court's granting of the State's motion to excuse prospective Juror Number 389 for cause where the juror appears to be impartial and agrees to follow the judge's instructions, constituted a denial of a fair and impartial jury[,] which resulted in the denial of due process and the equal protection of the laws of the U.S. Const.[] amend. IV [and] the Ohio Const[.] art. I, [§§] 2[,] 16.

5.    The conviction of the Appellant for the charge of aggravated murder in this case is against the manifest weight of the evidence.  The evidence was insufficient as a matter of law to support Appellant's conviction for aggravated murder and should be reversed.

6.    The Appellant's right to effective assistance of counsel [was] prejudiced by counsel's deficient performance.

7.    It is an abuse of discretion for the trial court to deny Appellant's Rule 29 motion for acquittal regarding the attempted aggravated murder charge.

8.     It is error for the trial court to fail to instruct the jury pursuant to the request of Appellant on law pertinent to the case[,] all in violation of Appellant's rights as guaranteed in the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution.

9.     It is prejudicial error for the trial court to remove [a] juror for expressing reservations [about] the verdict.

10.    The trial court commits prejudicial error in failing to instruct the jury as requested by the Appellant in the second phase of th[e] trial in violation of the Appellant's Fifth, Sixth, Eighth[,] and Fourteenth Amendment rights to the United States Constitution.

11.    [OHIO REV. CODE §] 2929.04(B)(7) is unconstitutionally vague and may be understood by jurors as [a] reason[] for imposing the death sentence.

12.    The Due Process Clause is violated by a jury charge which permits a criminal conviction on proof less than beyond a reasonable doubt.

13.    It is prejudicial error to sentence Defendant to the death penalty, when, based upon the law and the record of this case, the sentence of death herein is inappropriate and is disproportionate to the penalty imposed in similar cases, in violation of Defendant's rights as guaranteed to him by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U. S. Constitution and Sections 5, 9, 10, and 16 of Article One of the Ohio Constitution.

14.    [OHIO REV. CODE §§] 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05[,] as read together and as applied in this case[,] violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10, and 16 of Article I of the Ohio Constitution.

15.    The proportionality review that this Court must conduct in the present capital case pursuant to Ohio Revised Code Section 2929.05 is fatally flawed and therefore the present death sentence must be vacated pursuant to the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, Sections 5 and 10, Article I of the Ohio Constitution and Ohio Revised Code Section 2929.05, in violation of [Group's] rights as guaranteed to him by the Fifth, Eighth, and Fourteenth Amendments to the U. S. Constitution and Sections 5, 9, 10[,] and 16 of Article One of the Ohio Constitution.

16.    It is error for a trial court to impose a death sentence when the death penalty law as currently applied in Ohio violates [OHIO REV. CODE §] 2929.05(A) by requiring appellate courts and the [Ohio] Supreme Court, in conducting their

[OHIO REV. CODE §] 2929.04(A) review of "similar cases" for proportionality, to examine only those cases in which a death sentence was imposed and ignore those in which a sentence of life with a parole eligibility after twenty full years or life with a parole eligibility after thirty full years was imposed.  The current method also violates the rights to a fair trial and due process, results in cruel and unusual punishment, and implicates others of Appellant's protected rights as well, all as set forth in the Fifth, Sixth, Eighth, Ninth[,] and Fourteenth Amendments to the United States Constitution and in Sections 1, 2, 5, 9, 10, 16[,] and 20, Article I of the Ohio Constitution.

(Doc. 21-3 at 45–48).  The Ohio Supreme Court affirmed Group's convictions and sentence in December 2002.  *Group*, 98 Ohio St. 3d at 275.

Group petitioned for post-conviction review while his direct appeals were pending.  In June 2003, Group amended his post-conviction petition to assert the following claims:

1.   [Group] did not receive effective assistance of counsel during the trial phase of his capital trial. . . . [Counsel was] unprepared for a hearing on counsel's own motion [to disqualify the Prosecutor's Office.] . . . [O]ne of his lawyers, Jerry McHenry, repeatedly dosed off. . . .  [T]he defense lawyers failed to prepare Petitioner to testify . . . . [D]efense lawyers failed to call a witness from Ohio BCI, who [could] have testified about negative test results, including a negative gunshot residue test. . . . [D]efense lawyers told him that they did not want to litigate vigorously pretrial motions for fear of angering the judge and the prosecutors. . . . [O]ne of Petitioner's lawyers, Andrew Love, kept calling Petitioner Fred, and he called other people by the wrong name as well.
     . . .

2.   [Defense counsel was] totally unprepared for a motion hearing [on a motion for a gag order]. . . . [C]ounsel were ineffective for failing to prepare adequately for hearings.
     . . .

3.   Defense counsel was ineffective under the Sixth Amendment of the United States Constitution for misleading the jury on the material issue of the DNA identity of the blood found on Scott Group's shoe. . . . The failure of Petitioner's trial counsel to obtain a defense DNA expert, to have promised that one would testify and then not produce one, and to fail to cross-examine the State's expert effectively, fell below objective standards of performance for counsel in capital cases.
     . . .

9

4.  Defense [counsel] prejudicially failed to obtain an expert on the issue of the physical impairment of Scott Group's right hand.
. . .

5.  Petitioner's convictions, death sentence, and other sentences are void or voidable because the trial court used an anonymous juror system.
. . .

6.  [T]rial counsel failed to prepare their client to testify and thereby opened the door to devastating impeachment of Petitioner when he testified, "I never robbed anybody in my life."
. . .

7.  [D]efense counsel created a situation permitting further devastating impeachment of Petitioner. . . . Defense counsel opened the door to the use of [] letters [Group had written and sent from jail] with Petitioner's testimony.
. . .

8.  Petitioner did not receive effective assistance of counsel during the trial phase of his capital trial [because] [m]itigation was incongruent, inconsistent[,] and incomplete.
. . .

9.  Counsel's failure to voir dire the jury effectively regarding mitigating factors and counsel's failure to rehabilitate jurors violated Petitioner's rights under the United States Constitution's Fifth, Sixth, Eighth, and Fourteenth Amendments and Petitioner was prejudiced.
. . .

10.  Counsel's failure to file a motion for a change of venue and to voir dire the jury effectively regarding pretrial publicity violated Petitioner's rights under U.S. Const.[] amend[s]. VI and XIV and Ohio Const.[] art. I, §§ 1, 2, 5, 10, and 16.
. . .

11.  Petitioner's trial counsel . . . failed to cross-examine Mrs. Lozier effectively, denying Petitioner the twin liberties protected by the Sixth and Fourteenth Amendments of confrontation and the effective assistance of counsel.
. . .

12.  Petitioner was denied compulsory process, due process of law, and the effective assistance of counsel . . . [w]hen his trial counsel failed to subpoena and call to the stand scientific witnesses from the Ohio Bureau of Criminal Identification & Investigation.
. . .

10

13.      [P]etitioner's trial counsel did nothing to investigate the possibility of Ferguson as a suspect or present him to the jury as a source of reasonable doubt. . . . Further, Petitioner's trial counsel did not prepare Petitioner's witnesses to testify according to the norms employed by trial lawyers.

(Doc. 21-6 at 59, 74, 76–77, 80–84, 88, 90, 93, 95, 98, 100, 105–06, 111 (citations omitted)).

The State moved for summary judgment (Doc. 21-7 at 1–44).  Group opposed the motion and alternatively moved for the appointment of an expert (*id*. at 116–48).  The court granted the summary-judgment motion and denied appointment of an expert (Doc. 21-8 at 20–55).  Group timely appealed to the Mahoning County Court of Appeals (Doc. 21-9 at 10).  He raised two assignments of error:

1.      The trial court erred and abused its discretion by granting summary judgment to the State, and dismissing Appellant's petition for post-conviction relief.

2.      The trial court erred and abused its discretion in denying the petition without conducting an evidentiary hearing or permitting discovery, thus depriving Appellant of liberties secured by U.S. Const. amend. XIV and Ohio Const. art. I, §§ 1, 2, 10, and 16, including meaningful access to the courts of this State.

(*id*. at 110).  The appellate court affirmed (*id*. at 259).  Group then appealed to the Ohio Supreme Court, raising one proposition of law:

To deny a post-conviction capital defendant who makes a colorable showing that discovery will aid in presenting constitutional errors is a denial of due process and meaningful access to the courts of this State.

(Doc. 21-10 at 4, 8).  The court declined to accept jurisdiction (*id*. at 222).

**Federal Habeas Proceedings**

In July 2013, Group filed a notice of intent to initiate this habeas action and moved for appointment of counsel and leave to proceed in forma pauperis (Docs. 1–3).  This Court granted both Motions and appointed the Capital Habeas Unit of the Federal Public Defender's Office to represent him (Docs. 4–5).

11

Group moved for discovery in January 2015.  The State opposed, and Group replied (Docs. 40, 41 & 44).  This Court denied the Motion with prejudice as to certain discovery requests and without prejudice as to others (Doc. 49).

Group also moved for leave to amend his Petition and add another claim for relief, which the State also opposed, and to which Group replied (Docs. 45–47).  This Court granted the Motion (Doc. 50).  Some three months later, the State moved for leave to respond to the additional claim (Doc. 51), but this Court denied the Motion as untimely (Doc. 53).

### PETITIONER'S GROUNDS FOR RELIEF

Group asserts eight grounds for relief.  They are:

1.   Trial counsel rendered ineffective assistance in the culpability phase because counsel's cross-examination of the State's key witness, Sandra Lozier, was inadequate.

2.   Trial counsel rendered ineffective assistance in the culpability phase as trial counsel failed to present a cogent defense to create reasonable doubt that Petitioner was the offender because trial counsel failed to prepare Petitioner's alibi witnesses or present evidence of another suspect.

3.   Trial counsel rendered ineffective assistance in the culpability phase because counsel failed to utilize an expert to rebut the State's DNA evidence and trial counsel's cross-examination of the State's DNA expert was ineffectual.

4.   Trial counsel rendered ineffective assistance in the culpability phase because counsel failed to present objective evidence demonstrating a serious physical impairment to Petitioner's hands making it improbable that Petitioner could fire a gun, and trial counsel failed to present evidence to show that microscopic tests for gunshot residue on Petitioner's hands were negative.

5.   The trial court's dismissal for cause of a properly qualified non-biased juror from the panel deprived Petitioner Scott Group of his Fifth, Sixth, Eighth and Fourteenth Amendment rights under the United States Constitution.

6.   The trial court's dismissal for cause of a properly qualified non-biased alternate juror who expressed reservations about the verdict deprived Petitioner Scott Group of his Fifth, Sixth, Eighth[,] and Fourteenth Amendment rights under the United States Constitution.

12

7. Petitioner Scott Group was convicted on evidence insufficient to sustain essential elements of attempted aggravated murder, and intimidation in violation of Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments.

8. Trial counsel rendered ineffective assistance in the culpability phase because trial counsel failed to conduct a proper investigation to determine the content of the defense DNA expert's testimony and, consequently, trial counsel falsely promised the jury it would hear important testimony from a defense DNA expert.

(Doc. 16 at 34, 40, 50, 63, 75, 80, 83; Doc. 45-1 at 1 (citations omitted)).

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs Group's Petition. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA, which amended 28 U.S.C. § 2254, was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *(Michael) Williams v. Taylor*, 529 U.S. 420, 436 (2000)) (citations omitted).

### AEDPA Deference

Section 2254(d) forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

1. resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2. resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Habeas courts review the "last explained state-court judgment" on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis omitted). "When a federal claim has been

13

presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

A state-court decision is contrary to "clearly established Federal law" under Section 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *(Terry) Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). "[R]eview under [Section] 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). "Clearly established Federal law" for purposes of the provision "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003); *see also White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (explaining that "only the holdings, as opposed to the dicta, of [Supreme] Court[] decisions" qualify as "clearly established Federal law" for purposes of Section 2254(d) (citations and internal quotation marks omitted)). "And an 'unreasonable application of' those holdings must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *Woodall*, 134 S. Ct. at 1702 (quoting *Lockyer*, 538 U.S. at 75–76). "The critical point is that relief is available under [Section] 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *Id*. at 1706–07 (quoting *Harrington*, 562 U.S. at 102).

A state-court decision is an "unreasonable determination of the facts" under Section 2254(d)(2) only if the court made a "clear factual error." *Wiggins v. Smith*, 539 U.S. 510, 528–29 (2003). This

Court's review of state-court factual findings is limited to "the evidence presented in the State court proceeding," and Petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013); *see also* 28 U.S.C. § 2254(e)(1). "[I]t is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).

Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102–03 (internal quotation marks omitted). Thus, Petitioner "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

But AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id*. at 102. "Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Moreover, the deference AEDPA demands is not required if Section 2254(d) does not apply to a claim. Federal habeas courts may review de novo an exhausted federal claim that was not adjudicated on the merits in state court. *See Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005).

15

**Procedural Default**

A federal court may not consider "contentions of general law which are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure." *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). If a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). A procedural bar is "independent" when a state court applies the rule without relying on federal law, *id.* at 732–33, and "adequate" when the procedural rule is "firmly established and regularly followed" by state courts, *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009) (internal quotation marks omitted). If a petitioner fails to fairly present a federal constitutional claim to the state courts and no longer can present that claim to a state court, the claim is procedurally defaulted. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).

This Court employs a four-step analysis to assess procedural default:

First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule. Second, the federal court must determine whether the state courts actually enforced the state procedural sanction -- that is, whether the state courts actually based their decisions on the procedural rule. Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. . . . Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001).   If a claim is procedurally defaulted, a federal court may excuse the default and consider the claim on the merits if the petitioner demonstrates either (1) cause for the petitioner not to follow the procedural rule and prejudice from the alleged constitutional error, or (2) that a fundamental miscarriage of justice would result from denying federal habeas review.  *Coleman*, 501 U.S. at 750.

A petitioner can establish cause by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Objective impediments include an unavailable claim or interference by state officials that made compliance with state procedural rules impracticable. *Id*.  If the procedural default can be attributed to counsel's constitutionally inadequate representation, that failing can serve as cause so long as the ineffective-assistance-of-counsel claim was presented to the state courts. *Id.* at 488–89.  If the ineffective-assistance claim was not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective-assistance claim. *Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000).

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982).  "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000).

A narrow exception to the cause-and-prejudice requirement exists where a constitutional violation "probably resulted" in the conviction of a person who is "actually innocent" of the crime for

17

which he was convicted in state court.  *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 496).  The petitioner must show "by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law."  *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992).

### DISCUSSION

**First, Second, Third, Fourth, and Eighth Grounds for Relief**
***Ineffective Assistance of Trial Counsel***

Group claims trial counsel's performance denied him his Sixth Amendment right to effective assistance of counsel.  Specifically, he complains counsel failed to adequately:  (1) cross-examine Sandra; (2) prepare Group's alibi witnesses and develop his defense concerning an alternate suspect; (3) investigate and present DNA evidence and related expert testimony; and (4) present evidence of Group's impaired hand and inform the jury that tests performed to detect gunshot residue on Group's hands were negative (Doc. 16 at 34, 40, 48, 50, 63–64; Doc. 45-1 at 1).

**Ineffective Assistance of Counsel: Standard**

The Sixth Amendment right to the effective assistance of counsel at trial "is a bedrock principle in our justice system."  *Martinez v. Ryan*, 132 S. Ct. 1309, 1317 (2012).  The Court announced a two-part test for claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984).

First, a petitioner must show counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id* at 687.  Counsel's performance must fall "below an objective standard of reasonableness."  *Id.* at 688.  A reviewing court must "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time."  *Id.* at 689.

18

Second, a petitioner must show he was prejudiced by counsel's errors with "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. Because ineffective-assistance-of-counsel claims are mixed questions of law and fact, *id.* at 698, a habeas court reviews such claims under AEDPA's "unreasonable application" prong, *see, e.g.*, *Mitchell v. Mason*, 325 F.3d 732, 737–38 (6th Cir. 2003).

Prevailing on an ineffective-assistance-of-counsel claim through habeas review is no easy task. "Judicial scrutiny of counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. "*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment,'" recognizing "the constitutionally protected independence of counsel and . . . the wide latitude counsel must have in making tactical decisions." *Cullen*, 563 U.S. at 195 (quoting *Strickland*, 466 U.S. at 689–90). And because the standards imposed by *Strickland* and Section 2254(d) are both "highly deferential," applying both standards together results in "doubly" deferential review. *Harrington*, 562 U.S. at 105. The question for a habeas court "is simply whether there is 'any reasonable argument'" that counsel's performance was professionally reasonable. *Davis v. Carpenter*, 798 F.3d 468, 474 (6th Cir. 2015) (quoting *Harrington*, 562 U.S. at 105).

19

**Procedurally Defaulted Claims (First and Second Grounds for Relief)**

Group claims in his First Ground for Relief that trial counsel provided ineffective assistance by not adequately cross-examining Sandra.  Specifically, he complains trial counsel failed to: (1) drive home inconsistencies between Sandra's description of her shooter and Group's physical appearance; (2) use medical records to impeach Sandra's statement that she lost consciousness after the shooting; and (3) emphasize that she could not recall Group's name, even though Group's name was visible on the Ohio Wine uniform he wore during deliveries to the bar (*see* Doc. 16 at 34–39).  Group claims in his Second Ground for Relief that trial counsel were ineffective for failing to present a "cogent" alibi defense or offer evidence pointing to a different suspect, Brian Ferguson (*see* Doc. 34 at 33).

The state appellate court, the last state court to provide a reasoned judgment on these claims, found them barred by res judicata.  *See State v. Group*, 2011-Ohio-6422, at ¶¶ 126, 134–35 (Ct. App.).  This Court analyzed the effect of those rulings at length in the context of Group's motion for discovery, and concluded that these claims are procedurally defaulted (*see* Doc. 49 at 8–16).  This Court also found Group has not shown good cause to excuse the default because the claims lack merit.  This Court adopts and incorporates that analysis here.

**DNA Evidence and Expert Testimony (Third and Eighth Grounds for Relief)**

Group asserts in his Third and Eighth Grounds for Relief that trial counsel were constitutionally deficient in their handling of DNA evidence and related expert testimony.  He specifically complains they failed to: (1) present an expert to testify regarding DNA blood evidence found on the shoes Group wore when he voluntarily surrendered to police; (2) adequately cross-examine the State's DNA expert; and (3) sufficiently investigate their chosen DNA expert's availability and willingness to testify, while promising the jury it would hear testimony from a DNA expert (Doc. 34 at 51; Doc. 45-1 at 1).  The

20

Ohio Supreme Court adjudicated the first two claims on the merits, preserving them for habeas review.

The Ohio court of appeals found the third barred by res judicata, but alternatively ruled on the merits.

   ***Defense DNA Expert***.  Group faults trial counsel for failing to secure an expert to testify about

DNA blood evidence found on his shoes (Doc. 34 at 60–64).

   In rejecting this claim, the Ohio Supreme Court reasoned:

   Group contends that defense counsel never had independent tests performed on the
   DNA evidence.

   The record indicates that Cellmark Diagnostics performed DNA testing for the
   prosecution in this case.  The defense was allotted funds for its own DNA testing and
   submitted DNA samples to Lifecodes Corporation.  Before trial, one of the prosecutors
   advised the trial court that, due to an acquisition, Cellmark and Lifecodes were now part
   of the same corporation.  However, the defense counsel representing Group at that time
   had no objection to using Lifecodes; they were satisfied that the two testing facilities
   were independent of each other.

   At trial, Group had counsel different from those representing him on appeal.  Trial
   counsel represented to the court that Dr. Baird, the Lifecodes expert, had read the
   Cellmark report and that his "cursory * * * evaluation" was that contamination may
   have taken place so as to render DNA testing "useless."  (Baird did not test the blood
   sample because Cellmark's testing had used it up.)  According to defense counsel, Baird
   subsequently refused to testify, because "they are both in the same company, and * * *
   he did not want to challenge a coworker."  Counsel tried to enlist Roche Laboratories,
   but Roche refused to get involved in the case at such a late date.

   The record does not show either deficient performance or prejudice.  Group's original
   counsel apparently satisfied themselves that Cellmark and Lifecodes were independent.
   That situation did not change until later, when the DNA expert from Lifecodes backed
   out.  When that happened, defense counsel tried to line up a replacement.  Nothing in
   the record indicates that Group's counsel were at fault.

   As to prejudice, no one can say how a DNA expert from a different laboratory would
   have testified.  Moreover, defense counsel cross-examined the Cellmark expert on the
   subject of contamination.

*Group*, 98 Ohio St. 3d at 269–70.

Group claims the court incorrectly excused counsel for failing to obtain a DNA expert because Dr. Baird refused to testify at the last minute and a replacement could not be found. He maintains that counsel's deficient performance lies not in the last-minute predicament, but in how they got into that situation in the first place: by not recognizing the conflict of interest between the State and defense experts' laboratories and consulting with Dr. Baird in time to either confirm his participation or retain a new expert (Doc. 34 at 52, 60–63). Group stresses that counsel knew of the conflict and Group himself had "warned" them Dr. Baird could not testify (*id*. at 62).

The State responds that the Ohio Supreme Court's findings were fully supported by the record (Doc. 24 at 43). This Court agrees. At a hearing held nine months before the trial began, the prosecutor explained to the trial court:

> [T]he company that is performing the defense analysis [Lifecodes] has been acquired by the company that is to perform the State's analysis [Cellmark]. They're two independent companies but it is my understanding that they would have the same shareholders. It is two operations. One doesn't have anything to do with the other except for our company . . . acquired the defense's company . . . .

(Doc. 22-1 at 48–49). Group's counsel added that the companies were located in different states (*id*. at 49). The parties then both represented to the court that despite the two companies' new relationship, there was no conflict of interest. Group's counsel stated:

> It was disclosed to me immediately on the telephone. . . . [I]t is our belief that they are separate. It is also our belief that a scientific test is a scientific test and the only thing we're going to check on is the protocols they use, each lab, to do the test. We don't feel that there is a problem.

(*Id*. at 49–50). The prosecutor agreed:

> I don't feel there is a problem either. I wanted it to be a matter of record that we all agree on that, that there is no potential conflict of interest that I see from my standpoint and likewise from the defense's standpoint.
> . . .

22

> [W]e all acknowledged the situation as it exists and we understand it is two separate facilities, nonetheless, two separate testing procedures and there is no conflict with regard to the tests that are being performed by their company.

(*Id*. at 50–51).  The trial court was satisfied the issue had been resolved (*id*. at 51).

Group misstates the record in claiming trial counsel did not adequately "engage" with Dr. Baird before trial (Doc. 34 at 61–63).  At a hearing held prior to the scheduled testimony of the State's DNA expert, Group's counsel explained to the court that they had "done everything [they] could possibly do to get a DNA expert in here," but "were essentially hung out to dry" (Doc. 22-5 at 652).  When trial counsel first began to work on Group's case, Group's former counsel gave them the Cellmark and Lifecodes reports and explained the connection between the two companies.  Trial counsel then contacted Dr. Baird, who offered his initial impression of the Cellmark report and agreed to testify on Group's behalf about possible contamination of the blood evidence.  Counsel sent Dr. Baird a contract guaranteeing his fee and agreed to pay for his travel expenses.  After that, counsel claimed Dr. Baird "became almost impossible to reach."  Trial had already begun by the time Dr. Baird informed counsel he was no longer willing to testify for Group because "he did not want to challenge a coworker, co-DNA expert."  Counsel then tried to find another expert, but could not (*id*. at 549–53).

On these facts, this Court cannot conclude the Ohio Supreme Court's decision was unreasonable.  Dr. Baird's personal refusal to testify for Group because he did not want to challenge a coworker does not prove a conflict of interest between Cellmark and Lifecodes.  And, since counsel had no reason to believe Dr. Baird would back out at the last minute when the parties had previously agreed there was no conflict and Dr. Baird had agreed to testify, there was nothing more counsel should have done.  "The Supreme Court has never reached the specific question[]" of "how hard" an attorney must try to secure an expert.  *Davis*, 798 F.3d at 473.  Perhaps Group wishes counsel had done more

23

to ensure that Baird or another expert was available and willing to testify at trial.  "In the absence of any guidance from the Supreme Court as to how hard an attorney must work to find an expert, however, a fairminded jurist could conclude that [counsel]'s efforts fell in the permissible zone between 'best practices' and outright incompetence."  *Id.* at 474 (citing *Harrington*, 562 U.S. at 102).

The Ohio Supreme Court also reasonably determined that Group was not prejudiced by his trial counsel's failure to secure a DNA expert.  Group argues the state court did not adjudicate this issue on the merits because Ohio law dictates that "the Ohio Supreme Court does not adjudicate claims if the defendant must resort to evidence outside the appellate record to show prejudice," and extra-record evidence would have refuted the state court's observation that "no one can say how a DNA expert from a different laboratory would have testified" (Doc. 34 at 63–64).  He thus urges this Court to review the decision de novo.  Regardless of whether Group accurately states Ohio law on this point, as discussed below, this Court agrees with the Ohio court's second basis for finding no prejudice: Group's counsel adequately cross-examined the State's expert on the contamination issue.  The state court's application of *Strickland* to this ineffective-assistance claim, therefore, was not an unreasonable application of clearly established federal law.

***Cross-examination of State DNA Expert***.  Group also claims in his third ground for relief that his counsel was ineffective in cross-examining the State's DNA expert, Dr. Reynolds.  He contends counsel was not adequately prepared (Doc. 34 at 69–70), and provides numerous examples where counsel's questions were confusing, convoluted, or inexact, leaving Dr. Reynolds "lost" and "befuddled" (*see id*. at 65–71).  The court rejected this claim, reasoning:

> Group also suggests that his counsel did not prepare adequately before cross-examining the state's DNA expert witness.  However, the record indicates that defense counsel researched the subject of DNA thoroughly before cross-examining the Cellmark expert.  Group does not identify any mistakes made by defense counsel as a result of allegedly inadequate preparation.

24

*Group*, 98 Ohio St. 3d at 270.

"'[D]ecisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature' and generally will not support an ineffective assistance claim.'" *Davie v. Mitchell*, 291 F. Supp. 2d 573, 604 (N.D. Ohio 2003) (quoting *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002); *see also United States v. Steele*, 727 F.2d 580, 591 (6th Cir. 1984) (concluding cross-examination fell "within the area of trial tactics and strategy that should not be subjected to second guessing and hindsight by this Court" and noting "an attorney must be free to determine questions of trial strategy"). "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (internal quotation marks omitted).

The Ohio Supreme Court reasonably concluded counsel's cross-examination of Dr. Reynolds was thorough and effective. Counsel told the court that Dr. Baird had recommended preparation material and counsel worked "feverishly" to prepare, reading several books and consulting with people familiar with DNA testing (Doc. 22-5 at 652). The court also assured Group that because he had lost his expert, defense counsel had "wide latitude" in cross-examining Dr. Reynolds (*id*. at 654). Finally, although counsel's questioning at times was not as artful or exact as it could have been, in nearly every instance Group cites, Dr. Reynolds was able to provide a comprehensive and meaningful answer after brief clarification (*see, e.g.*, *id.* at 701 ("I think what you're asking me is sometimes, with PCR, there are some substrates that don't amplify well.")). And in many other instances, Dr. Reynolds agreed with counsel's characterization of the technology or evidence (*see, e.g.*, *id.* at 684–85 (repeatedly answering "[t]hat's right" and "that is correct")).

25

The state court correctly concluded that Group has not identified any specific mistakes counsel made during cross-examination that prejudiced his case, or any additional information that counsel should have uncovered that would have benefitted his case.  On the particular issue of whether the blood evidence was contaminated, Dr. Reynolds was adamant in her position that the State's DNA test results were "extraordinarily clean" (*id*. at 695).  "Again," she testified, "there's no indication of any kind of mixture that would cause me to feel that these samples were contaminated in any way" (*id*. at 695–96).  Group may be dissatisfied with counsel's inability to impeach Dr. Reynolds and cast doubt on the DNA test results, especially on the contamination issue, but that does not mean counsel's performance was deficient under *Strickland*'s exacting standard.  *See Van Arsdall*, 475 U.S. at 679.  The Ohio Supreme Court did not contravene or misapply Supreme Court precedent in rejecting this claim.

***Promise to Jury Regarding Defense DNA Expert***.  Group asserts in his Eighth Ground for Relief that trial counsel failed to properly investigate Dr. Baird and falsely promised the jury that the defense would present a DNA expert to prove the blood evidence was contaminated (Doc. 45-1 at 1).  He contends that counsel's "empty promise eviscerated the defense team's credibility with the jury and created an adverse inference against the defense presented, thereby prejudicing" Group (*id*. at 2).

Group raised this claim on post-conviction review.  The trial court dismissed it as barred by res judicata, and the Ohio court of appeals affirmed.  *Group*, 2011-Ohio-6422, at ¶ 92.  The appellate court ruled:

> In his third ground for relief, Group argues that trial counsel was ineffective for "misleading" the jury, during opening statements, into believing that defense would present a DNA expert at trial.  Group specifically asserts: "The failure to provide the promised DNA expert caused the defense to lose all credibility because the DNA results were material and outcome determinative.  The State's DNA results, if scientifically valid, place Petitioner at the scene of Mr. Lozier's murder."  Again, Group cites directly to the record in support of this claim.  He also cites to Powers' affidavit.  For all of the aforementioned reasons, the trial court correctly concluded this claim is barred by res judicata.

26

*Id.* The appellate court alternatively ruled that even if the claim were not procedurally barred, it lacked merit, because Group could not prove prejudice given the weight of the evidence of Group's guilt. *Id.* The court explained:

> [T]he evidence of the guilt of Scott Group is overwhelmingly persuasive -- a constellation of both direct and circumstantial evidence pointing convincingly and powerfully to Scott Group as the perpetrator, one who shot his victims in cold blood, and then later -- from his jail cell -- attempted to hire a hit man in order to eliminate and thereby silence the sole survivor. This evidence includes: Mrs. Lozier's eyewitness identification of Group, which was reliable considering that Group, as her wine deliveryman, was no stranger to her; blood on Group's shoe that matched the DNA of Mr. Lozier, the murder victim; the fact that, while in prison, Group tried to enlist several others to falsify evidence and to eliminate or intimidate Mrs. Lozier; and the fact that the box of Ohio Wine invoices was missing from the Downtown Bar after the shootings.

*Id.* at ¶ 88 (internal quotation marks omitted).

Group acknowledges his claim may be procedurally defaulted, barred by res judicata, but he argues he should be excused by the ineffective assistance of post-conviction counsel (Doc. 45-1 at 10–18). The State, however, has not raised the procedural default defense, and it is waived. *See, e.g.*, *Trest v. Cain*, 522 U.S. 87, 89 (1997) ("Procedural default is normally a 'defense' that the State is 'obligated to raise' and 'preserv[e]' if it is not to 'lose the right to assert the defense thereafter.'" (quoting *Gray v. Netherland*, 518 U.S. 152, 166 (1996))).

Where federal habeas courts disregard a procedural-bar ruling, the state court's alternative merits ruling receives AEDPA deference under Section 2254(d)(1). *See, e.g.*, *Brooks v. Bagley*, 513 F.3d 618, 624–25 (6th Cir. 2008) ("[A]n alternative procedural-bar ruling does not alter the applicability of AEDPA."). Given the overwhelming evidence of Group's guilt, including the victim's consistent identification of Group as the shooter, it was not unreasonable for the state appellate court to discount the effect counsel's unfulfilled promise had on the jury's verdict. Further, while Group

describes counsel as promising the jury would hear "game-changing DNA evidence" (Doc. 45-1 at 18), counsel in fact peppered his statement with suppositions (*see* Doc. 22-4 at 450 ("In all likelihood we anticipate that this expert . . . will determine, we anticipate, that these artifacts are contaminates and . . . render any DNA testing moot.")).  Group's speculation that the jury must have "expect[ed] a major evidentiary development" based on these comments does not show the state court's prejudice determination was objectively unreasonable (Doc. 45-1 at 19).  And, in any event, counsel thoroughly cross-examined the State DNA expert regarding contamination, even if counsel did not impeach the expert to the extent Group may have wished.  This sub-claim is meritless.  *See Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006) ("If Petitioner fails to prove either deficiency or prejudice, then Petitioner's ineffective assistance of counsel claims must fail.").

### Firearm-Related Evidence (Fourth Ground for Relief)

Group claims in his Fourth Ground for Relief that trial counsel failed to develop evidence showing: (1) Group's physical impairments made it "improbable" that he could have fired a gun; and (2) his hands lacked gunshot residue at the time of the arrest (Doc. 34 at 73).  Only the latter sub-claim, however, is preserved for habeas review.

***Physical Impairment Evidence***.  At trial, Group testified about physical impairments that he claims affected his ability to hold and fire a gun, including a gunshot wound affecting his right hand and arm, a broken right thumb that was later re-broken, and lacerations to his left arm from putting his left hand through a glass window (Doc. 16 at 66–67).  Group faults trial counsel for failing to develop additional evidence at trial suggesting he was physically incapable of holding and firing a gun.  The post-conviction court found this claim barred by res judicata, and the court of appeals affirmed.  *Group*, 2011-Ohio-6422, at ¶¶ 93–95.  As with Group's First and Second Grounds for Relief, this Court

incorporates its previous analysis finding this sub-claim procedurally defaulted without good cause to excuse the default (*see* Doc. 49 at 17–18).

***Gunshot Residue Evidence***.  Group faults trial counsel for failing to present a witness who could have explained the "exculpatory" test results showing no gunshot residue was present on Group's hands when he was arrested (Doc. 34 at 86–87, 90–91).

Group raised this claim on direct appeal to the Ohio Supreme Court, which rejected it on the merits.  The court opined:

> Group further contends that counsel did not employ "a scientific investigation unit" to show that Group did not fire a gun on January 18, 1997.  But Group fails to show either prejudice or deficient performance.  As to prejudice, there is no way for us to tell whether the results of such testing would have helped Group's case.  As to performance, counsel's performance cannot be characterized as deficient, because the record indicates that no valid test was possible.
>
> Officer Lou Ciavarella testified that he performed a gunshot residue test on Group's hands on the afternoon of January 18, 1997.  However, Ciavarella's test took place at 3:25 p.m., more than four hours after the shooting.  According to Ciavarella's unchallenged testimony, the Bureau of Criminal Identification and Investigation ["BCI"] recommends that any gunshot residue test be done within two hours after a gun is fired because the residue tends to rub off a person's hands over time.  Thus, a negative test would have been devoid of probative value.

*Group*, 98 Ohio St. 3d at 269.  Group claims the state court's determination that "no valid test was possible" because more than two hours had passed is an unreasonable determination of the facts under Section 2254(d)(2) (Doc. 34 at 86).  The testimony to which Group refers is this:

> Q.  Do you know why BCI recommended a two-hour limit?
> A.  For the most part they recommended a two-hour limit because as time goes on, there is an ever more probable -- it's ever more probable that the individual will have wiped some or the majority of the debris off his hands.  Any time you are rubbing your hands together, putting your hands in your pockets, washing your hands, driving a car, rubbing your hands on the steering wheel, winding a window, all of these things make that debris disappear.
>
> Q.  How about if you go into a restroom and wash your hands?
> A.  Exactly.

29

(Doc. 22-5 at 28). He contends that Ciavarella's testimony implied it is in fact possible to detect gunshot residue when a hand is swabbed after the BCI's recommended two-hour time period, and therefore his negative test result was "exculpatory" evidence (Doc. 34 at 86 (citing Doc. 22-5 at 28)). He criticizes the court for "misconstru[ing] BCI's two hour recommendation as the equivalent of a scientific impossibility" and posits that the police must have considered the gunshot residue test worthwhile or they would not have conducted the test (*id.*).

Group has not met his burden of rebutting the Ohio court's factual findings "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Burt*, 134 S. Ct. at 15. Ciavarella may have implicitly acknowledged it is *possible* some gunshot residue *may* remain on hands longer than two hours after firing a gun, but he also explained BCI recommends a two-hour limit because the likelihood of a false negative increases thereafter. Group fails to show it was objectively unreasonable for the Ohio Supreme Court to conclude the negative test result carried minimal probative value.

Group further argues the Ohio court did not adjudicate the merits of *Strickland*'s prejudice prong for this claim because, under Ohio law, "the Ohio Supreme Court does not adjudicate a claim if the defendant must resort to evidence outside the appellate record to show prejudice" (Doc. 34 at 87 (citing *State v. Kirkland*, 140 Ohio St. 3d 73, 83 (2014); *State v. Mammone*, 139 Ohio St. 3d 467, 501 (2014); *State v. Keith*, 79 Ohio St. 3d 514, 535–36 (1997))). He maintains this Court should therefore review his claim de novo. Group misstates the law. In the cases he cites, the court simply recognized that defendants sometimes need extra-record evidence to prove their claims, and because the court is precluded from considering such evidence, the claims are more appropriately presented post-conviction. The court went on, however, to rule on the claims. *See, e.g.*, *Keith*, 79 Ohio St. 3d at 536 ("Regardless, we find that appellant has failed to prove prejudice."). The Ohio Supreme Court

30

reasonably concluded that Group could not show that he was prejudiced by counsel's failure to present additional evidence concerning the negative gunshot residue test.

**Fifth and Sixth Grounds for Relief**
*Jury Challenges*

Group argues in his Fifth and Sixth Grounds for Relief that the trial court denied him a fair and impartial jury by excusing two properly qualified jurors (Doc. 16 at 75, 80).  Group raised these claims on direct appeal to the Ohio Supreme Court, which adjudicated them on the merits.  The claims are therefore preserved for federal habeas review.

The Sixth Amendment commands that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury"  U.S. CONST. amend. VI.  The Sixth Amendment "reflect[s] a profound judgment about the way in which law should be enforced and justice administered. . . .  Providing an accused with the right to be tried by a jury of his peers g[ives] him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge." *Duncan v. Louisiana*, 391 U.S. 145, 155–56 (1968).  Due process requires "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982).

**Juror Disqualification (Fifth Ground for Relief)**

Group claims the trial court improperly excused for cause a prospective juror, Juror No. 389, who stated that she was opposed to the death penalty but would follow the law (Doc. 16 at 75–80).  In adjudicating this claim, the Ohio Supreme Court reasoned:

> Group contends that it was improper to dismiss jurors for cause because they expressed reservations about capital punishment. . . . He contends that prospective juror No. 389 was improperly excused for cause because of her opposition to the death penalty.

31

Prospective juror No. 389 stated that although she did not believe in capital punishment, she could vote for it "[w]hen the state proves it to me."  She also stated that in order for the state to prove it to her, it would have to present more than one eyewitness to the crime:

"Q.    What kind of proof do you think you would want?
A.    Hard evidence that he really did this.

Q.    Like what?
A.    Like what?

Q.    Yeah.
A.     I don't know.

* * *

Q.    How about an eyewitness?
A.    A couple.  Not one.  I will need more than one.

* * *

Q.    If I only had one eyewitness, that would not be enough?
A.    That's his word against my word.  Like, I'd have to weigh it.  I really need more than one."

The prosecutor also asked the prospective juror, "What if I told you that we don't have the gun that was used to kill Mr. Lozier."  The prospective juror's response was "How can you prove that he -- that he did something if you don't have the gun?"

The state challenged prospective juror No. 389 for cause.  In ruling on the challenge, the trial judge expressed her concern that, although the prospective juror had indicated that she would follow the law in the penalty phase, she would not follow the law in the guilt phase but would hold the state to a higher burden of proof than the law prescribed. The judge concluded: "I don't think that she understands the law, and I don't think she'll follow the law in that regard."

The defense then requested a further opportunity to question the prospective juror.  The judge granted the request.  During this additional voir dire, defense counsel tried to explain the difference between proof beyond a reasonable doubt and proof beyond all doubt.   Counsel then asked the prospective juror whether she would use the reasonable-doubt standard if so instructed, and the prospective juror answered, "Yes."

32

But when the prosecutor asked the prospective juror what "beyond a reasonable doubt" meant to her, she gave confused responses: "They have to prove to me all the evidence, everything that comes in, prove to me beyond a reasonable doubt." She went on to explain, "They have to prove to me. Make my mind up * * * with all of the evidence they have." The prosecutor asked, "With two eyewitnesses and a gun?" "Yes," said the prospective juror.

"The proper standard for determining when a prospective juror may be excluded for cause based on his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath."

The trial judge here determined that the prospective juror did not understand the concept of "proof beyond a reasonable doubt" and would not follow the law in that regard. We must defer to that finding if the record supports it, and, in this case, the record does. Prospective juror No. 389 said that she would hold the state to an extraordinarily high burden of proof in the guilt phase of a capital case, requiring the state to produce two eyewitnesses and the murder weapon before she would vote to convict. Her opinion persisted despite the best efforts of defense counsel to explain what the state's burden actually was. Because the record supports the trial judge's decision to grant the challenge for cause, we overrule Group's first and fourth propositions of law.

*Group*, 98 Ohio St. 3d at 254–55 (citations omitted).

In *Witherspoon v. Illinois*, 391 U.S. 510 (1968), the Supreme Court recognized the Sixth Amendment's guarantee of an impartial jury provides capital defendants the right to a jury not "uncommonly willing to condemn a man to die." *Id.* at 521. At the same time, the State has a "legitimate interest in excluding those jurors whose opposition to capital punishment would not allow them to view the proceedings impartially, and who therefore might frustrate administration of a State's death penalty scheme." *Wainwright v. Witt*, 469 U.S. 412, 416 (1985). During voir dire, therefore, a prosecutor may probe into prospective jurors' views of the death penalty, and may challenge for cause a potential juror who appears unwilling to return a capital sentence. *Id.* at 423–24. Only "a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause." *Uttecht v. Brown*, 551 U.S. 1, 9 (2007). A juror is properly excused "where

33

the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Witt*, 469 U.S. at 425–26.

Federal habeas courts accord "special deference" to state trial courts in applying these standards, because trial judges are in the best position to assess the demeanor and credibility of the jurors. *See, e.g.*, *Darden v. Wainwright*, 477 U.S. 168, 175–78 (1986). "The question is not whether the trial judge was wrong or right in his determination of impartiality, but merely whether his decision was 'fairly supported by the record.'" *Bowling v. Parker*, 344 F.3d 487, 519 (6th Cir. 2003) (quoting *Witt*, 469 U.S. at 433). A trial court's finding "may be upheld even in the absence of clear statements from the juror that he or she is impaired." *Uttecht*, 551 U.S. at 7. And "when there is ambiguity in the prospective juror's statements, 'the trial court . . . [is] entitled to resolve it in favor of the State.'" *Id.* (quoting *Witt*, 469 U.S. at 434). Thus, federal habeas courts, in reviewing *Witherspoon-Witt* claims, like ineffective-assistance claims, must be "doubly deferential." *White v. Wheeler*, 136 S. Ct. 456, 460 (2015) (internal quotation marks omitted).

Group emphasizes that Juror No. 389 should not have been excused for cause because she stated fourteen times that she would follow the court's instructions on the law (Doc. 16 at 76 (citing Doc. 22-3 at 733, 737, 742–43, 745, 748, 751, 760–61, 766–69)). But the record shows the juror's assurances that she could follow the law were belied by her consistent position that she would impose a higher standard of proof than the law requires. As the Ohio Supreme Court noted, Juror No. 389 repeatedly affirmed the State would need to present at least two eyewitnesses and the murder weapon to convince her of Group's guilt (*see* Doc. 22-3 at 748–50, 770). She also agreed the proof should show Group's guilt "beyond all doubt" because it was a capital crime (*id.* at 752). It is her views on the standard of proof for capital defendants, rather than the death penalty itself, that "substantially impaired" her ability to

34

follow the law. *Witt*, 469 U.S. at 434.  The trial judge conducted a "'diligent and thoughtful *voir dire*'"; "considered with care the juror's testimony; and . . . was fair in the exercise of her 'broad discretion' in determining whether the juror was qualified to serve in this capital case." *Wheeler*, 136 S. Ct. at 461 (quoting *Uttecht*, 551 U.S. at 20).

Group contrasts the trial court's treatment of Juror No. 389 with that of another juror, Juror No. 318, whom the court refused to remove for cause after the defense challenged her on the ground that she was biased in favor of the death penalty (Doc. 16 at 76–78).  Group points out that Juror No. 318 stated under oath that she thought the death penalty should be imposed for every murder; could not presume Group innocent until proven guilty; thought Group should testify if he had nothing to hide; and believed mitigation evidence to be nothing more than excuses (*id*. (citing Doc. 22-1 at 660, 669–70; Doc. 22-2 at 22, 26–30)).  Group argues that "[n]either side, nor the court, were able to move her off of those positions[,] [but] because she said she could follow the law, the court refused to excuse her for cause" (*id*. at 78).

First, the trial court's treatment of Juror No. 318 has no bearing on the constitutionality of Juror No. 389's dismissal.  Second, Juror No. 318 qualified her positions on most of the issues Group cites. For example, after stating her belief that "if [defendants] go out and murder someone, they deserve to die," she continued, "I think that there might be reasons -- there might not be reasons, but certain circumstances where I wouldn't feel that way" (Doc. 22-1 at 660).  She also confirmed, "I believe in the death penalty, but, again, I think I'm fair enough that I could make a different opinion if [the State] did not prove [its] case to me" (*id.* at 669).

Group finally argues the trial court's removal of Juror No. 389 violated state law (Doc. 16 at 80).  However, the Supreme Court has "repeatedly held that a state court's interpretation of state law,

including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)).

In short, the Ohio Supreme Court reasonably determined that the trial court's decision to excuse Juror No. 389 for cause was fairly supported by the record and not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

**Juror Removal (Sixth Ground for Relief)**

Group argues the trial court erred when it removed an alternate juror who expressed reservations about the jury's verdict (Doc. 16 at 80–82). In rejecting this claim, the court stated:

> Group contends that the trial judge abused her discretion by removing an alternate juror who did not agree with the jury's verdict of guilt on the aggravated murder charge.
>
> After the jury returned its verdicts, the trial court asked each of the four alternate jurors whether they could "accept" the verdicts rendered by the jury on the aggravated murder charge and its specifications. Each one said that he or she could.
>
> Before the penalty phase, a juror was dismissed and replaced with the first alternate juror. However, as soon as the alternate learned that she was to sit on the jury in the penalty phase, she advised the trial judge that she was "emotional and a little shook up" and that she wanted to address the court.
>
> In chambers, the former alternate -- now designated juror No. 10 -- said that, while she felt that the evidence tended to show guilt, she was "bothered by a lot of things that the police didn't do." She stated, "[F]or a sentence as serious as this, it's kind of bothersome to me, because I think he should have had the advantage of whatever investigating the -- the police did and there just were too many things that weren't done." She further said, "I accept [the verdict], but with reservations." She admitted that she had a reasonable doubt of Group's guilt and would "[p]robably not" have voted to convict. Although she had previously told the court that she could accept the verdict, she later explained that she thought she "had no choice." The trial judge excused juror No. 10 and replaced her with the second alternate.

36

Group contends that excusing this juror was "manifestly arbitrary," and therefore an abuse of discretion, because the juror's "reservations" as to the verdict did not indicate an inability to be impartial.

We disagree.  The trial court's decision was supported by the juror's persistent reservations as to the verdict.  The jury's right to recommend a sentence is predicated on the jury's finding of the defendant's guilt beyond a reasonable doubt.  It would be difficult for a juror who could not accept the jury's finding of guilt to consider the penalty with impartiality.

We further note that the juror raised the issue with the court.  The trial judge could reasonably interpret that fact as an indication that the juror doubted her own ability to serve in the penalty phase.  Moreover, the juror appears to have felt strongly about the issue.  Finally, her statement suggests that her reservations would in fact have affected her judgment as to the sentence: "[F]or a sentence as serious as this, * * * it's kind of bothersome to me * * *."

*Group*, 98 Ohio St. 3d at 257–58 (citations omitted).

Group argues the trial court erred in removing Juror No. 10 from the jury because, although the juror expressed reservations about Group's guilt, she never said that she could not accept the jury's verdict (Doc. 16 at 82).  The trial judge's determination, however, was fully supported by the record.  When the court asked Juror No. 10 whether she would have entered a guilty verdict during the culpability phase, she answered "[p]robably not" (Doc. 22-7 at 294).  She also expressly confirmed she had "a reasonable doubt that the State did not prove their case" (*id.* at 303).  On these facts, the Ohio Supreme Court's decision neither contravened nor misapplied federal law.

### Seventh Ground for Relief
#### *Sufficiency of the Evidence*

Group argues in his Seventh Ground for Relief that the State failed to produce sufficient evidence supporting his convictions for attempted aggravated murder under OHIO REV. CODE § 2903.01(B) and intimidation under OHIO REV. CODE § 2921.03(A) (Doc. 16 at 83).  Group raised this claim on direct appeal to the Ohio Supreme Court, which addressed it on the merits.

37

The Due Process Clause of the Fourteenth Amendment requires a state to prove every element of a crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979). A habeas court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. "[T]he *Jackson* inquiry does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993). This Court must limit its review to evidence adduced during trial. *Herrera*, 506 U.S. at 402. Sufficiency-of-the-evidence claims are assessed "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16. Because both *Jackson* and AEDPA apply to Group's sufficiency claim, this Court's review requires deference at two levels. "First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (internal quotation marks omitted).

### Attempted Aggravated Murder

Group claims the evidence adduced at trial was insufficient to satisfy the elements of attempted aggravated murder (Doc. 16 at 83–84). He argues that his only intent was to solicit Perry to firebomb Sandra's house, not to murder her, and "[m]ere solicitation does not rise to the level of attempt" under Ohio law (*id.* at 84 (citing *State v. Dapice*, 57 Ohio App. 3d 99 (1989)).

The Ohio Supreme Court, in rejecting this claim, reasoned:

Group contends that the state introduced insufficient evidence to prove him guilty of attempted aggravated murder. When a defendant challenges the legal sufficiency of the state's evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

38

The state's evidence showed that Group had asked Adam Perry to firebomb Mrs. Lozier's house.  In exchange, Group said he would give Perry $150,000 and would dissuade a witness from testifying in Perry's trial.  Group gave Perry Mrs. Lozier's address, gave him instructions for making a firebomb, and instructed him to drop a key chain with the name "Charity" on it.

However, Perry took no further action in furtherance of the plan against Mrs. Lozier after knocking on her door and finding that she was still living in her house.  Perry testified that he had no intention of killing Mrs. Lozier and that Group had assured him that the house was vacant.

Group argues that "based upon [Perry's] testimony there is absolutely no evidence of an attempted aggravated murder of Sandra Lozier at the time of this incident."  The state contends that Group's actions in this case -- repeatedly asking Perry to firebomb the house, giving him the address and the firebomb recipe, offering to reward him, instructing him to leave a false trail -- were enough to permit the jury to find him guilty of attempted aggravated murder.

The crime of attempt is defined by [OHIO REV. CODE §] 2923.02(A), which provides: "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."

We have elaborated on the statutory definition as follows: "A 'criminal attempt' is when one purposely does or omits to do anything which is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."  A "substantial step" requires conduct that is "strongly corroborative of the actor's criminal purpose."  "[T]his standard does properly direct attention to overt acts of the defendant which convincingly demonstrate a firm purpose to commit a crime, while allowing police intervention * * * in order to prevent the crime when the criminal intent becomes apparent."
. . .

Two Ohio courts have concluded that merely soliciting another person to commit a crime does not constitute an attempt.  That also appears to be the majority view nationally.

However, Group did more than merely solicit the firebombing of Mrs. Lozier's house.  He took all action within his power, considering his incarceration, to ensure that the crime would be committed.  He offered Perry a large monetary reward and a reciprocal favor.  He gave Perry Mrs. Lozier's address and told him how to make the bomb.  He repeatedly wrote to Perry urging him to complete the act.
 . . .

39

"The federal courts have generally rejected a rigid or formalistic approach to the attempt offense.  Instead they commonly recognize that '[t]he determination whether particular conduct constitutes * * * [an attempt] is so dependent on the particular facts of each case that, of necessity, there can be no litmus test to guide the reviewing courts.' * * * Following this analysis, which we consider the better reasoned approach, several federal courts have concluded that a solicitation accompanied by the requisite intent may constitute an attempt."

We agree with the federal courts that "a rigid or formalistic approach to the attempt offense" should be avoided.  Nothing in the language of [OHIO REV. CODE §] 2923.02(A), or in our own precedents, compels such an approach.  [OHIO REV. CODE §] 2923.02(A) defines attempt broadly as "conduct that, if successful, would constitute or result in the offense."  *In State v. Woods*, *supra*, 48 Ohio St. 2d 127, paragraph one of the syllabus, we defined a "criminal attempt" as "an act or omission constituting a substantial step in a course of conduct planned to culminate in [the actor's] commission of the crime."  A "substantial step" requires conduct that is "strongly corroborative of the actor's criminal purpose."

With reference to "overt acts," we said in *Woods* that the "substantial step" standard "properly direct[s] attention to overt acts of the defendant which convincingly demonstrate a firm purpose to commit a crime, while allowing police intervention * * * in order to prevent the crime when the criminal intent becomes apparent."  Thus, we conclude that an "overt act" is simply an act that meets the "substantial step" criterion enunciated in *Woods*.

Group's acts -- offering Perry $150,000 to throw a firebomb through the window of Mrs. Lozier's house, providing him with her address, repeatedly importuning him to commit the crime, and instructing him how to make the bomb and how to misdirect any subsequent police investigation -- strongly corroborate Group's criminal purpose, and therefore constitute a substantial step in a course of conduct planned to culminate in the aggravated murder of Mrs. Lozier.  We therefore find that the evidence presented was sufficient to prove the essential elements of attempted aggravated murder.

*Group*, 98 Ohio St. 3d at 261–63 (citations and footnote omitted).

As he did before the Ohio Supreme Court, Group argues that solicitation does not rise to the

level of attempt under Ohio law.  But "it is not the province of a federal habeas court to reexamine

state-court determinations on state-law questions."  *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

This Court thus limits its review to "determining whether the evidence was so overwhelmingly in favor

of the petitioner that it compelled a verdict in his or her favor."  *Thompson v. Bock*, 215 F. App'x 431,

436 (6th Cir. 2007); *see also Moore v. Duckworth*, 443 U.S. 713, 714–15 (1979) ("The Court of Appeals properly deferred to the Indiana law governing proof of sanity" in determining a sufficiency-of-the-evidence claim.).

Here, the Ohio Supreme Court expressly rejected a "rigid or more formalistic approach" to attempt offenses, in which "merely soliciting another person to commit a crime does not constitute an attempt," distinguishing the very case Group cites to support his petition. *See Group*, 98 Ohio St. 3d at 262 (citing *Dapice*, 57 Ohio App. 3d at 104). Instead, the court endorsed a "substantial step" standard, in which solicitation is sufficient to establish attempt if "strongly corroborative of the actor's criminal purpose." Applying that standard, the court concluded that Group's actions, which were "more than merely solicit[ing] the firebombing of Mrs. Lozier's house," strongly corroborated his criminal intent to murder Sandra. *Group*, 98 Ohio St. 3d at 263. This Court defers to the Ohio Supreme Court's analysis of state law, and agrees with the court that, based on the record evidence, a "rational trier of fact could have found the essential elements of [attempted aggravated murder] beyond a reasonable doubt." *Jackson*, 443 at 319.

**Intimidation**

Group also claims the evidence adduced at trial was insufficient to satisfy the elements of intimidation (Doc. 16 at 83–84). He argues there was no evidence that he or Perry "threatened, or took any action to put Mrs. Lozier in fear to prevent her from testifying" (*id*. at 84.)

The Ohio Supreme Court rejected this claim as well, stating:

Group . . . also contends that the state failed to prove him guilty of intimidation, which is defined in [OHIO REV. CODE §] 2921.03(A). We disagree.

The state presented the following evidence to support this charge: Group hired Perry to firebomb Mrs. Lozier's house so that she would not testify against him. In June 1998, Perry knocked on Mrs. Lozier's door and asked her whether a "Maria something

41

lived there." When Mrs. Lozier said no, Perry thanked her and left. Mrs. Lozier saw Perry looking around at the neighboring houses, which gave her a "little bit of a scare." She watched Perry drive away and noted that he did not stop at any nearby houses. When she looked up the name Perry had given her, she found that no such person lived on her street. She described Perry's car to a neighbor and asked her to watch for it. Two days later, Sergeant Martin told Mrs. Lozier that someone had been hired to kill her. She told Martin about the incident with Perry, whereupon he advised her to move out of her house right away. She followed this advice.

On these facts, the state presented sufficient evidence to permit the jury to find Group guilty of intimidation. [OHIO REV. CODE §] 2921.03(A) provides: "No person, knowingly and by force [or] by unlawful threat of harm to any person or property, * * * shall attempt to influence, intimidate, or hinder a * * * witness in the discharge of the [witness's] duty."

There is no question that Group intended to influence, intimidate, or hinder Mrs. Lozier in discharging her duties as a witness. Moreover, given Mrs. Lozier's reaction to Perry's visit, the jury could reasonably find that Perry's words and actions constituted a threat within the meaning of the statute.

*Group*, 98 Ohio St. 3d at 263–64.

Again, the Ohio court's decision is supported by the record and is neither contrary to, nor an unreasonable application of *Jackson*.

### CERTIFICATE OF APPEALABILITY ANALYSIS

This Court must determine whether to grant a Certificate of Appealability ("COA") for any of Group's grounds for relief. Group may not appeal this Court's denial of any portion of his Petition "[u]nless a circuit justice or judge issues a certificate of appealability," which "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). Group must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted). With respect to Group's procedurally defaulted claims, Group must

show "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.*

This Court concludes reasonable jurists could not debate (1) the finding that Group procedurally defaulted certain claims without good cause to excuse the default or (2) the disposition of those claims Group preserved for habeas review.  The Ohio courts thoroughly considered Group's arguments and rejected them with considerable record support.  This Court thus denies Group a COA as to all claims.

## CONCLUSION

For the foregoing reasons, this Court denies Group's Petition for Writ of Habeas Corpus (Doc. 16).  This Court further certifies that there is no basis upon which to issue a certificate of appealability. 28 U.S.C. § 2253(c).

IT IS SO ORDERED.

___ s/ *Jack Zouhary* ____
JACK ZOUHARY
U. S. DISTRICT JUDGE

January 20, 2016

43